## ARMCO INTERNATIONAL CORPORATION
### v. REDERI A/B DISA et al.
#### No. 343.

Circuit Court of Appeals, Second Circuit.
Aug. 22, 1945.

6

See also, D.C., 52 F.Supp. 668.

Herbert M. Statt and Haight, Griffin, Deming & Gardner, all of New York City (Herbert M. Statt and Maurice J. Smith, both of New York City, of counsel), for claimant-appellant.

F. Herbert Prem and Bigham, Englar, Jones & Houston, all of New York City, for libellant-appellee.

Wilbur H. Hecht and Duncan & Mount, all of New York City (Henry W. Dieck, of New York City, of counsel), for William Spencer & Son.

James V. Hayes and Donovan, Leisure, Newton & Lumbard, all of New York City (Carl C. Manderen, of New York City, of counsel), for Pitney and Gardner, trustees.

William E. Stevenson and Debevoise, Stevenson, Plimpton & Page, all of New York City, for Michael J. Carpinello.

Before L. HAND, AUGUSTUS N. HAND, and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

Rederi A/B Disa, as claimant of the motorship "Astri," appeals from a decree in the admiralty, holding it liable for damage to a parcel of 1313 iron plates, part of the ship's cargo, upon a voyage from Philadelphia to Buenos Aires in February

and March, 1940. The issues upon the appeal are: (1) Whether the libellant proved that the ship had stowed the plates negligently; (2) whether that part of the damage which occurred after the discharge at Buenos Aires was chargeable to the ship; (3) whether, if the ship was liable for any part of the damage, she should have a decree over, fixing final liability upon William Spencer & Son Corp., or Michael J. Carpinello; (4) whether in any event the libellant proved that it was the owner of the goods, or entitled to maintain the action. Most of the evidence was taken by depositions, although the judge heard two experts, and the testimony of one, Nigro, the receiving clerk of Sottnek & Co., who were the stevedores for the "Astri's" agent in New York—Thor-Eckert & Co. The testimony was not in dispute; the only questions of fact are as to what inferences should properly be drawn from it. The ship had four holds: two forward of the motor room, and two aft. The forward hatches—numbers one and two—were separated by permanent steel bulkheads; and the after hatches—three and four—by a wooden bulkhead, only in the lower hold. At Philadelphia the ship lifted 1313 iron plates, distributed as follows: 62 in number one hatch; 376 in number two; 663 in number three; 212 in number four. The injury which occurred on board was to the plates in the after holds. Those in number three were stowed evenly upon the ceiling to a height of about one and one-half to two feet on either side of the shaft tunnel. After leaving Philadelphia the "Astri" went to New York where she lifted her other cargo, among which were 23 iron drums of acetic acid, each weighing about 1200 pounds. The Central Railroad of New Jersey delivered these in a barge at the wharf alongside of which the "Astri" lay. They employed William Spencer & Son Corp., stevedores, to discharge the barge and put the drums on the wharf alongside the "Astri." At the time of their delivery to the stevedores the master of the barge called their attention to the fact that one of the drums was leaking; and the railroad notified Carpinello, a cooper, to send someone to mend it. Carpinello sent his son who examined it while it was still on the wharf, decided that it was impossible to mend, and so told Healy, the receiving clerk of the railroad. Spencer & Son Corp. did not lade the drum upon the ship; and, although the record does not disclose just who did do so, the inevitable inference is that the lading was by the stevedores, Sottnek & Co., employed by the ship's agent. The leaking drum was never repaired but was stowed with the rest on top of the plates in hold number three. That the ship had notice that the drum had been leaking was proved by a copy of the receipt which Nigro delivered to the ship, and which bore a notation in the handwriting of one, Conroy, Nigro's subordinate, that the drum had been leaking, but had been re-coopered. (That notation did not appear upon the original which Nigro delivered to the railway.) Furthermore, the ship knew that the drums contained acetic acid, for a document, known as the "booking report," made up by the ship's agents, so stated; and it was this report on which the ship's officers made up the stowage plan. It does not appear what assurance Conroy supposed that he had for saying that the leak had been repaired; on the record he merely so declared and Nigro and the ship's officers in charge of the stowage must have accepted his statement without investigation.

The "Astri" reached Buenos Aires on March 8, 1940, and six employees of the consignee together with members of the crew discharged the plates on the 12th and 13th, the consignee being an agency of the Argentine Government. Some of them were seen to be wet at the time with a liquid which smelled like vinegar; and Alessandro, an employee of the consignee, asked the tally clerk on the ship what this was, who answered that in fact it was vinegar. The consignee loaded the plates directly from the ship onto railroad cars, mixing all indiscriminately, regardless of the holds from which they had come. The railroad carried them a short distance to a warehouse where they were stacked, again indiscriminately, and where they remained for about two weeks—until March 25th—by which time the consignee had discovered the damage and for the first time advised the local agent of the libellant, who had until then, so far as appears, not even known that any of them had been wet at the outturn. Upon discovering that the damage was so serious, the consignee rejected the whole consignment and refused to pay the price; eventually the libellant accepted the rejection, and took back the plates; in July 1940, they were sold at public auction to the libellant's agent in Buenos Aires; and the claim is for the loss.

It appeared from expert testimony that acetic acid corrodes such plates, not only when it directly touches them, but also when its fumes surround them; and the judge found that the damage in this case was from both sources. The ship does not dispute that any acetic acid which actually reached the plates would damage them, but it denies that the fumes would do so, or did do so. We accept the finding, for the judge saw the libellant's expert, a well qualified metallurgist, who said that the fumes would corrode; and, although the ship's expert denied this, his experience in no sense gave him equal authority, and even if it had done so, the judge's preference would have been final. The ship answers that if the libellant's expert was right, the ship's frames in hold number three should also have suffered, and that they did not. The libellant rejoins that the fumes would not injure painted iron, and that the frames were painted; and so the judge found. It is true that we cannot find anything on the point in the record, but clearly we should not assume that they were not painted. The ship knew whether they were and did not say, and, so far as we may be permitted to guess, we should assume that they must have been. Hence there was every reason to suppose that not only the plates in hold number three which the acid did not actually touch, but all those in hold number four suffered damage while on the ship. Not so, as we have said, in the case of those in holds numbers one and two. Nobody suggests, not even the ship's expert, that it would not be negligent to stow a leaking drum of acetic acid on top of iron plates; and since that is exactly what the ship did, we need not consider the propriety of the stowage, had the drums all been tight.

We might stop here, and ordinarily we should, for it is not the usual practice in admiralty suits to decide the extent of the damage or any issue incidental to damages, in advance of a reference. In the case at bar, however, both parties have argued the question how far the ship is liable for the damage done to such plates as were not wet on board the ship; the judge made a finding about it; apparently all the available evidence is before us; and it will greatly advance the final decision of a cause already long delayed. So far as there is any uncertainty as to the extent of the damage which happened while the plates were on board, the ship has the burden of proof. Schnell v. Vallescura, The, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373; Commercial Molasses Corporation v. New York Tank Barge Corporation, 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89; United States v. Los Angeles Soap Co. 9 Cir., 83 F.2d 875; Wessels v. Asturias, The, 2 Cir., 126 F.2d 999; Edmond Weil, Inc., v. American West African Line, 2 Cir., 147 F.2d 363. That is enough to charge her with all damage in holds numbers three and four, since she did not, and indeed could not, prove what part was done aboard and what ashore. She insists, however, that in no event should she be held for damage to the cargo after it was discharged. There are two answers to this. First, as to the plates in holds numbers three and four, the difficulty remains that the ship cannot separate the damage done ashore from that done on board. Next, both as to those plates and to the plates from holds numbers one and two, the damage which did happen ashore was the direct result of the negligence of the ship while the plates were on board. Whether the consignee later contributed to that damage is another matter, which we reserve for the moment, but the situation is not one of damage arising independently of the ship's own negligence before discharge. We know of no authority that liability for the consequences of such negligence ends when the cargo goes over the rail, and such a doctrine would be absurd to the last degree.

Therefore, the question comes down to whether the consignee failed to take proper care of the plates after the discharge, and whether the ship—which on this issue also has the burden of proof—has shown how much of the damage arose from that failure. Alessandro testified that he observed many which were "entirely wet" and had been "oxidized"; but he did not connect the "oxidizing" with the liquid, or at least it does not appear that he did. Nor was there any reason to do so, for, as we have said, he was told that the liquid was vinegar, from which acetic acid is indistinguishable in smell. This being so, we can see no reason to condemn as negligent the piling of all the plates upon the railway cars; those from holds numbers one and two along with the rest. The discharge began on March 12th at an hour not stated, continued all night, and ended on the morning of the 13th, after nine cars had been filled. It does not appear in what order the plates from holds numbers

one and two were discharged; but, as we have said, all plates were mixed indiscriminately. The record does not disclose how long the plates remained in the cars before they were taken out and stacked in the warehouse; and the libellant's expert swore that the greater part of the damage would take place within a few hours after acetic acid touched them. There were apparently official records from which this period could have been ascertained, but they were not produced. Since there is nothing to charge the consignee until the plates were stacked in the warehouse, and since some part at least of the damage to the plates from holds numbers one and two probably occurred during that time, the ship failed to prove how much of the damage was caused by any negligence chargeable to the consignee. That alone is enough to charge her with all the damage.

■ In what we have said, we have assumed that the consignee was in fact negligent after the plates reached the warehouse; but that too is at best very doubtful. The only testimony is that of Olivera, who first saw them after they had been unloaded from the cars and brought into the warehouse, whenever that was. He swore that they were very generally wet and that there was some "superficial corrosion"; and he also swore that the liquid was acetic acid because of its smell. Why he should have at once concluded, because the liquid smelt like vinegar, that it was acetic acid, he did not say; and it is obvious that he may well have related back to the outset, information which he received later. Certainly it was most unlikely, unless he knew of the make up of the "Astri's" cargo that it should have contained acetic acid which had broken out of its containers. Be that as it may, the only thing which can with the least plausibility be thought to charge him with negligence, in his answer to the question why he did not wash the plates when he found that they had been wet with acetic acid. His reason was that the delivery had not been "in perfect condition." Read alone, this answer appears to refer to the time of the receipt of the plates; but that is improbable. The consignee was not likely to neglect proper precautions before it had decided to reject the plates, for they were presumptively its own. Moreover, it is clear that there was some delay in deciding whether or not to reject, for Olivera, when asked why the consignee delayed so long before sending the notice of rejection on the 25th, answered that "it must have been the time required to discover the condition of the plates and to comply with the usual administrative routine". The more reasonable interpretation of his testimony taken as a whole is that he did not at once connect the damage with the acetic acid at all; but did so only when the plates were in fact examined. Here too there was therefore an interval during which the plates from holds numbers one and two may have suffered further indeterminate injury without fault of the consignee. It is quite true that the parcel as a whole was not sold for more than three months after the consignee rejected it on March 25th; and it is possible that nothing was done to stop "oxidization" meanwhile, and that therefore the plates further deteriorated. But again no effort was made to show how much that delay further impaired their value; or what care was given to them meanwhile. We hold the ship to be liable for all the damage.

■ The ship argues that the contract was c.i.f.; that title passed when the documents were delivered; and that the buyer could not reject. That is quite untenable. Article four of the contract read as follows: "If the quality of the material supplied satisfies the stipulated conditions and the quantity delivered corresponds to the ranges stipulated, and there have been further satisfied the other contract conditions, the Department will issue the corresponding routine certificate for the quantity delivered." The "quality" of the "material" certainly did not satisfy the "stipulated conditions." In Transmarine Corporation v. Charles H. Levitt & Co., 2 Cir., 25 F.2d 275, 278, we held that a seller, who has been obliged to accept his buyer's rejection of the goods, becomes vested with the buyer's claim against a carrier for the damage which caused the buyer to reject. Nothing in Aunt Jemima Mills v. Lloyd Royal Belge, 2 Cir., 34 F.2d 120, in the least affects that ruling. We adhere to it.

■ It follows that the decree against the ship must be affirmed, and the only remaining question is as to any recovery over against William Spencer & Son Corp. or Carpinello. Against Carpinello there was no evidence whatever; the railroad employed him to cooper the drum, and his son reported that it could not be

done. He was under no duty to the ship. William Spencer & Son Corp. were employees of the railroad, and primarily at any rate, also owed no duty to the ship. Nevertheless, we will assume that they must have known that the drum was leaking, and that it would have been an implied deceit to stack it with the rest and not tell the ship's agent. But there is not the slightest evidence that they did not do so, and the burden was the ship's. Certainly the ship's agent knew that the drum had at one time been leaking, although they assumed that it had been coopered. The evidence is entirely consistent with William Spencer & Son Corp.'s having told Conroy that the drum was leaking, and that the railroad had sent someone to cooper it. That would have been a full discharge of any possible duty to the ship; if Conroy chose to take the will for the deed, as apparently he did, that was nobody's fault but Conroy's and Nigro's who relied upon him and the ship's which relied on her stevedores. It formed absolutely no basis for holding William Spencer & Son Corp.

Decree affirmed.