**NATIONAL DISTILLERS PRODUCTS CORP. v. COMPANHIA NACIONAL DE NAVEGACAO et al.**

Civ. A. 4512.

United States District Court
E. D. Pennsylvania.

Aug. 25, 1952.

Rawle & Henderson, Philadelphia, Pa., for the plaintiff.

Krusen, Evans & Shaw, Philadelphia, Pa., for the defendant, Companhia Nacional de Navegacao.

W. Wilson White, Thomas Raeburn White, Philadelphia, Pa., for the defendant, Reading Co.

FOLLMER, District Judge.

This is a suit by the consignee of a cargo of wine shipped from Portugal in 1944 and carried to Philadelphia on the Steamship "S. Thome," owned and operated by the defendant Companhia Nacional de Navegacao (hereinafter refer-

red to as "Companhia"). The cargo owner, National Distillers Products Corp., (hereinafter referred to as "National") sued both the shipowner and the Reading Company (hereinafter referred to as "Reading") as the railroad which transported the cargo from Philadelphia to its ultimate destination in New York. The case was tried to the Court and without a jury. From the pleadings and proof I make the following

### Findings of Fact

1. Plaintiff National Distillers Products Corp. is a corporation organized under the laws of the Commonwealth of Virginia, with its principal office in New York City. Defendant Companhia Nacional de Navegacao is a corporation organized under the laws of Portugal, and defendant Reading Company is a corporation organized under the laws of the Commonwealth of Pennsylvania.

2. On or about January 9, 1944, a shipment consisting of 250 pipes of ruby port wine and 250 pipes of tawny port wine was delivered by Marques del Merito, Lda. to Steamship "S. Thome" at Oporto, Portugal, for delivery to Philadelphia, Pennsylvania, to the order of The Chase National Bank of New York, with instructions to notify Marques del Merito, Inc., in care of the plaintiff, which was at all material times the owner of the shipment.

3. The capacity of the 500 pipes ascertained by the estimates of the United States Customs authorities in Brooklyn amounted to 70,816.4 American gallons.

4. The estimated capacity of the 310 pipes in the seven cars in which Reading is involved, as ascertained by the estimates of the United States Customs authorities in Brooklyn, amounted to 43,889.3 gallons.

5. The Steamship "S. Thome" arrived at Philadelphia on or about March 25, 1944, at which time, or shortly thereafter, the pipes were discharged from the vessel by stevedores engaged by the shipowner and placed on Pier D, Port Richmond, owned by defendant Reading.

6. Upon discharge of the cargo at Philadelphia, a large number of pipes were observed to be damaged and leaking. The cooper employed by the plaintiff to repair the damaged and leaking pipes repaired 192 out of the total cargo of 500.

7. The cooperage operation started about April 1, 1944, and continued for about one week.

8. The condition of the containers showing unmistakable evidence of cargo pressure and the extent of the loss of wine existing so shortly after they were removed from the vessel indicates clearly that they were damaged during the voyage.

9. There was no evidence of any loss on the pier that was not directly attributable to the damage caused during the voyage.

10. Because of the apparent damage noted when the shipment was landed a partial gauging was performed by the United States Customs at Philadelphia before the pipes were delivered to Reading. In conformity with the practice of the Customs authorities on an intransit inspection, only those containers which were observed by the Customs inspectors to show external signs of damage and/or loss of contents were opened and gauged. Accordingly, a total of 113 pipes were opened and gauged by the Customs inspectors who recorded an outage therefrom of 13,458.7 gallons; however, the Customs inspectors failed to gauge 79 additional pipes which had been recoopered and noted short of contents by the coopers.

11. Defendant Companhia conceded its liability for the amount of the loss as shown by the Customs gauging at Philadelphia, and accordingly offered no testimony to rebut the presumption that the damage caused while the cargo was under its control had occurred from causes for which it would be responsible under the provisions of the Carriage of Goods by Sea Act of 1936, 46 U.S.C.A. § 1300 et seq.

12. At the time of delivery to Reading the entire shipment was weighed and such weight, applied to the stipulated weight of 8.57 pounds per gallon of wine, established that the shipment then contained 16,307 gallons less than when weighed at the time of export and of this amount the seven cars involved in the claim against Reading con-

tained 15,085 gallons less than when weighed at the time of export.

13. Due to existing demands upon railroad facilities in the Port of Philadelphia at that time, Reading furnished car space for portions of the shipment when available. The 500 pipes were transported to Brooklyn in twelve freight cars, leaving Philadelphia at various times between the middle of April and the middle of June, 1944. Reading undertook this transportation over its own lines under the customary rail bill of lading.

14. The accountability of Reading Company for such inland carriage is confined to losses from seven of the cars, namely, VGN63092, CBQ323602, ACL28038, GMO8599, BAR65304, MILW19475, and NH30426; the Court having ruled by a preliminary opinion of July 31, 1951, 99F. Supp. 458, that any recovery for losses from the remaining five cars is outlawed by reason of failure of the plaintiff to comply with the notice provisions of the bill of lading.

15. The unloading of the cargo from the ship to the dock was by stevedores employed by the steamship company, while the loading of the cargo from the dock to the train was by stevedores employed by the railroad.

16. The gross shortage of the cargo on arrival at Brooklyn, as developed by the United States Customs gauge, was 20,446.7 gallons.

17. Because of the impossibility to fill pipes to capacity and because of the absorption of wine into the wood of the pipes, the normal expected outturn is less than the nominal or estimated capacity of the pipes. Under the evidence in this case the Court finds that the proper allowance for normal outage or shrinkage from the above causes in this case is 2% of the estimated capacity of the pipes.

18. Plaintiff's imported cost of the wine, including invoice cost, freight and insurance, was $1.71 per gallon for ruby port and $1.78 per gallon for tawny port.

19. There is no evidence from which the Court can find that the actual loss to plaintiff was greater than the cost of the wine.

## Discussion

There is no question but that on the arrival of the shipment of 500 pipes of wine at Philadelphia there was visible evidence that a number of the pipes were damaged and leaking. It appears that it is the practice of the Customs authorities on an intransit inspection to open and gauge only those containers which are observed by the Customs inspectors to show external signs of damage and possible loss of contents. Accordingly, a partial gauging of 113 pipes was performed by the Customs authorities at Philadelphia. This partial gauging disclosed that the 113 pipes gauged had a total shortage of 13,458.7 gallons under their capacity. Exactly one week after the ship arrived at Philadelphia, National engaged the services of a cooper who examined the shipment and repaired and recoopered the 192 pipes which gave evidence of damage or leakage. It will be noted that the Customs authorities gauged 79 pipes less than were recoopered and noted short of contents by the cooper. During all of this period a large portion of Reading's equipment was preempted because of the war effort. Consequently, through no fault of either National, Companhia or Reading, the shipment by rail from Philadelphia to Brooklyn did not start until April 10, 1944, and continued thereafter at intervals until June 15, 1944. At the time of loading each shipment was separately weighed by Reading and it is admitted by all parties that the railroad weights were correct. On arrival at Brooklyn the entire 500 pipes were gauged by the Customs authorities, at which time it was found that the outturn was approximately 20,446.7 gallons short of the capacity of the 500 pipes.

As to Reading, we are here only concerned with seven of the twelve carloads, the Court having ruled that as against Reading recovery must be disallowed as to five carloads because the requisite claims were not filed.

Companhia while admitting its liability for that loss which was shown to have occurred up to the time of the gauging by the Customs authorities shortly after the pipes were landed at Philadelphia, stoutly disclaims any further liability.

Reading attempted to disclaim any liability because of the inadequacy of the containers. It offered the testimony of its Freight Claim Agent, Charles F. Diamond, a veteran with thirty-four years experience in his field. Over the objection of plaintiff, the witness testified that the type of container here involved had been proved by his own experience and the universal experience of rail carriers to be inadequate to withstand normal rail carriage without loss. On the other hand, the plaintiff not only carefully established the substantial identity of these pipes with those in other shipments but further attempted to show by evidence of the behavior of other shipments that these pipes were adequate for transportation. I therefore feel that by introducing evidence of experience with similar shipments into its own case plaintiff has waived any objection to the admissibility of such evidence in the defendant's case.[1] However, regardless of that fact and with all of that sorry experience over a long period of years, Reading did accept these pipes for shipment. It cannot now be heard to complain.

Companhia offered no testimony, admitted its liability only for the loss as developed by the Customs gauge and argues that plaintiff by having the pipes examined and recoopered where necessary had assumed control over the shipment.

There is nothing in the record to indicate that the pipes were not in good condition or were inadequate for the purpose intended at the time of export. That being the case, the burden at that point then lies with the carrier by sea not only to exculpate itself by proving that harm resulted from a cause for which it is statutorily not liable or that it exercised due diligence to avoid and prevent the harm,[2] but it also has the burden of proof on the question of the extent of damage to the cargo which occurred while the cargo was on board the ship.[3] Companhia remained silent and accepted its liability for damage done on the sea voyage. We have found as a fact that not only was there no evidence of any loss on the pier that was not directly attributable to the damage caused during the voyage but that the condition of the containers, the evidence of cargo pressure and the extent of the loss so shortly after their removal from the vessel clearly indicated that they were damaged during the voyage. Having admitted its liability for damage during the voyage, Companhia failed completely to meet its burden to show the extent of that damage.[4]

The fact that plaintiff acted promptly to reduce the loss by recoopering is no indication that by so doing it assumed control of the shipment. That control remained with Companhia until assumed by Reading. There being no evidence to show any leakage while the cargo remained on the Reading pier except for a few days before they were recoopered, it would follow that Companhia's responsibility here is the loss as shown by the Reading weights at the time the cargo was loaded on the cars at Philadelphia for shipment to Brooklyn.[5]

Reading is liable for the loss as shown by the complete and final customs in Brooklyn as against the Reading weight made at Philadelphia as the pipes were loaded on the cars, excluding the five cars eliminated as set forth in Finding of Fact No. 14.

Plaintiff vigorously contends that a normal shrinkage allowance of only 1% should be allowed. Reading, on the other hand, convincingly shows that the average capacity of the pipes in this importation was 141.6 gallons; that the median yield from a low of 134 to a high of 141.6 would be 137.8 or an expected outage of 2¾%. Hylind, a marine surveyor and plaintiff's

---

1. Objection to competence is waived if the objecting party offers evidence of the same character. Trouser Corporation of America v. Goodman & Theise, Inc., 3 Cir., 153 F.2d 284, 287, 288.

2. American Tobacco Co. v. The Katingo Hadjipatera, D.C.S.D.N.Y., 81 F.Supp. 438.

3. Armco International Corporation v. Rederi A/B Disa, 2 Cir., 151 F.2d 5, 8.

4. Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373; Armco International Corporation v. Rederi A/B Disa, supra; The Vizcaya, D.C.E.D.Pa., 63 F.Supp. 898.

5. The Monte Iciar, 3 Cir., 167 F.2d 334.

witness, who surveyed the cargo after its arrival in Brooklyn, testified that "around three per cent" was the usual allowance for natural shrinkage. MacDougall, sales manager of plaintiff's import division, also plaintiff's witness, testified that the expected yield from a pipe of wine varies from 56 to 60 cases of 2.4 gallons each or 134 to 144 gallons. It is obvious that even the $2\frac{3}{4}\%$ figure is problematic. According to the experts, the estimated normal shrinkage in the trade is "around three per cent." Reading's computation, which as above indicated carries conviction, indicates a $2\frac{3}{4}\%$ normal shrinkage. Having in mind that that figure is not a mathematical certainty, it is believed that in this situation a fair and equitable median would be 2%. Accordingly, an allowance for normal shrinkage of 2% will be allowed.

■ Finally, as to the measure of damages, the plaintiff offered no evidence of any necessity of immediate replacement of the lost wine at a higher price, nor that the loss of the wine resulted in any diminution of gross sales because of a shortage of stock to sell. Applying the formula established in Continental Distributing Co., Inc. v. Reading Co., 3 Cir., 168 F.2d 967, to the facts of this case, plaintiff's damages will be assessed on the wholesale price or cost to it of the goods lost rather than the retail price or plaintiff's asking price to others before processing.

Conclusions of Law

1. The Court has jurisdiction of the parties and subject matter in this proceeding.

2. Any leakage on the pier between the time they were discharged from the holds of the Steamship "S. Thome" and the time they were recoopered was attributable to causes arising during the voyage.

3. Under the evidence, the shipowner is liable for the shortage of wine determined by deducting the shipping weight shown by the railroad at Philadelphia from the quantity initially shipped at Oporto.

4. Under the evidence, the railroad is liable for the balance of the shortage as shown upon delivery to the consignee at Brooklyn, excepting the loss in contents of the five cars involving delayed notice.

5. An allowance of 2% for normal shrinkage is allowed.

6. Damages must be computed on the basis of wholesale cost to plaintiff.

An appropriate order for judgment may be submitted. If the parties cannot agree upon damages, a further hearing will be held to determine the amount.