311 F.2d 334
 M. W. ZACK METAL COMPANY, Libellant-Appellant
v.
S.S. BIRMINGHAM CITY, her engines, boilers, etc. and Bristol
City Line ofSteamships, Ltd.,
Claimant-Respondent-Appellee, and The
Jarka Corporation,
Respondent-Impleaded-Appellee.
 No. 159, Docket 27741.
 United States Court of Appeals Second Circuit.
 Argued Nov. 7, 1962.
Decided Dec. 12, 1962.
 
 Anthony B. Cataldo, New York City, for libellant-appellant.
 Donald B. Allen, New York City (James E. Freehill and Hill, Betts, Yamaoka, Freehill & Longcope, New York City, on the brief), for claimant-respondent-appellaee.
 Joseph E. Soffey, New York City, (George J. Conway, New York City, on the brief), for respondent-impleaded-appellee.
 Before MEDINA, SMITH and KAUFMAN, Circuit Judges.
 MEDINA, Circuit Judge.
 
 
 1
 M. W. Zack Metal Company appeals from a final decree in admiralty dismissing its libel to recover for cargo damage against the S.S. Birmingham City and her owner, Bristol City Line of Steamships, Ltd. The stevedore Jarka Corporation was impleaded, but we will give no separate consideration to the crossclaim against Jarka as we have decided to affirm the decree.
 
 
 2
 There have been two trials. We reversed the first decree against Zack because the findings were too fragmentary and inadequate to cover all points of substance raised by the evidence. M. W. Zack Metal Company v. The S.S. Birmingham City, 2 Cir., 1961, 291 F.2d 451. We also reversed the rulings favorable to the vessel and her owner that the cargo ownerhs proof of ownership of the goods was not satisfactory and that the claim was time barred for failure of Zack to give the notice required by 46 U.S.C. 1303(6). On the new trial Zack produced further proof and, after due consideration, new and detailed findings were made and the libel was again dismissed on the merits. The findings and conclusions of Judge Clancy are reported at 1962 Am.Mar.Cas. 925.
 
 
 3
 Zack's claim is for damage to 77 bundles of steel shipped on the Birmingham City at the port of Avonmouth, England. The vessel docked at Hoboken, New Jersey, where the steel was unloaded, lightered to Weehawken and there loaded into railroad gondolas and transported to Detroit, Michigan, where some of the steel was found to be rusted and otherwise damaged. The specific 77 bundles with respect to which damage is claimed were ultimately rejected by a purchaser.
 
 
 4
 After the style of the great epic poems of the ancient Greeks and Romans, the briefs on both sides plunge immediately in medias res, and then proliferate in all directions, without even the semblance of an attempt to treat the sequence of events, and the proofs relating to them in a chronological or any other rational manner. It seems to be assumed that we know all about the case, and counsel have belabored one another with charges and countercharges that serve only as far-from-diverting digressions and result in a general mass of confusion. Zack in effect tells us the critical findings are clearly erroneous, and that the trial judge not only misapplied the law applicable to this rather common type of case, but that he also failed to make the very findings directed to be made by the prior opinion of reversal.
 
 
 5
 Under these circumstances we have felt the ends of justice required a careful scutiny of the entire trial transcript and the exhibits. As a result of this we are convinced the trial judge did precisely what it was contemplated he should do and, with one exception that does not affect the outcome, to be discussed in due course, we hold the findings are decisive of the issues and are supported by substantial evidence. We affirm the decree dismissing the libel.
 
 
 6
 Zack's claim is for damage to 77 bundles of steel sheets marked 'MIE/D'. These 77 bundles were: shipped from a plant at Ebbw Vale, England, on April 16, 1953; loaded aboard the Birmingham City by the employees of the shipowner at Avonmouth, England, on April 21-4; transported to Hoboken, New Jersey, where they arrived on May 5; unloaded by Jarkahs longshoremen on May 5 and 6; loaded on May 8 and 11 aboard a lighter of the Erie R.R. Co. by employees of the railroad; taken to Weehawken, New Jersey, where, on May 12 and 13, they were placed in three Erie freight gondolas and conveyed by rail to Detroit, Michigan, where they arrived at some time between May 18 and May 25, 1953.
 
 
 7
 These 77 bundles were part of a lot of 127 bundles of similar 'MIE/D' steel sheets and 137 other bundles of steel sheets marked 'MPD/D'. Each of the 'MIE/D' bundles weighed about two tons and consisted of iled steel sheets enclosed in protective waterproof paper, and given added protection by being enveloped in metal waster sheets, consisting of trumpeting around the edges and a top and bottom waster sheet. Each such package was then secured by three metal cross straps and the package thus strapped was placed on two wooden skids to which it was attached by lengthwise metal straps running completely around both the package and the skids. Thus the combination of skids and package with the two sets of metal straps, one crosswise around the package of doubly protected oiled steel strips, and package lengthwise and around both the package and the skids, became what is called in this record a 'bundle' of 'MIE/D' steel. The marking 'MIE/D' was superimposed in white paint against a black background on the top waster sheets, and was plainly visible. The 'MPD/D' bundles in the same shipment were made up in a similar manner but with one most significant difference. The 'MPD/D' bundles had no separate metal cross-strapping around the package. From the above it may be deduced, and the facts are clearly established in the record, that rust could only be formed on the oiled steel strips if both the waster sheets and the waterproof coverings were torn or broken, so that humidity in the atmosphere, rain, sea water, ship or cargo sweat, or other moisture could reach the inner strips of steel. It is also apparent that once moisture had penetrated apertures both in the torn waterproof envelopes and broken waster sheets, any subsequent recovering and rebanding alone could scarcely be expected to stop the progress of the rust. Implicit also in this basic factual background, including a whole series of loading and unloading operations, is the likelihood that witnesses were confused by the similarity of the 'MPD/D' bundles, in which we are not intersted except tangentially, and the 'MIE/D' bundles, damage to which presents the sole issue to be decided. Also, it should not surprise us to find some of the entries or statements, in the multiplicity of documents in evidence, inconsistent, confusing and unreliable. Most of the testimony was by deposition, but several of the principal witnesses gave their versions of what they saw at various times and places in plain view of the trial judge in open court.
 
 
 8
 Accordingly, unless we find some misapplication of the rules of law governing cargo damage cases, our inquiry is likely to be focused upon the trial judgehs findings. As these seem on their face to be dispositive of the issues, and as we shall find that so they are, we can readily understand why it is that counsel for Zack has tried so hard to persuade us that this Court, on the prior appeal, gave positive instructions that there be detailed findings with respect to particular factual matters not necessarily required by the rules of law applicable to these cargo damage cases. Here again, but only after a prolonged winnowing process, we find that no such directions were or could have been intended, and that the findings were adequate for all purposes relevant to the decision of the case, bearing in mind that issues of credibility, and those arising out of contradictory testimony, other inconsistencies and the general welter of exaggeration, hesitancy and half-truths, even in cases where the testimony is partly or even wholly by deposition, are primarily to be disposed of by the trial judge in a non-jury case, and not by an appellate court.
 
 
 9
 We turn to the applicable law. Under the Carriage of Goods by Sea Act, 46 U.S.C. 1303, 1304, the cargo owner bears the burden of proving delivery of the goods in good condition and outturn by the vessel, or by the stevedore for whose conduct the vessel was responsible, in damaged condition. The burden then shifts to the vessel to prove the damage occurred through a cause excepted under the Act or the exercise of due diligence to prevent the harm. Miami Stuctural Iron Corp. v. Cie Nationale Belge De T.M., 5 Cir., 1955, 224 F.id 566, 568; United States Smelting, Refining & Mining Co. v. Waterman S.S. Corp., E.D.La., 1945, 62 F.Supp. 511, 518, affirmed, 5 Cir., 1946, 155 F.2d 687, cert. denied, 1946, 329 U.S. 761, 67 S.Ct. 115, 91 L.Ed. 656; F. Badrena E. Hijo, Inc. v. The Rio Iguazu, E.D.La., 1960, 182 F.Supp. 885, 891-892; Schroeder Bros., Inc. v. The Saturnia, S.D.N.Y.,1954,123 F.Supp 282, 284, affirmed, 2 Cir., 1955, 226 F.2d 147. As stated in our prior opinion in this case, 'damaged outturn' could be established not only by proof that upon discharge of the cargo on the pier at Hoboken the inner sheets were already rusted or otherwise damaged, but might also be established by proof that the rust or other damage that may have developed after such discharge was caused by the vessel or by those for whose conduct the vessel was responsible. 291 F.2d at page 454. See also Armco International Corp. v. Rederi A/B Disa, 2 Cir., 1945, 151 F.2d 5, 8. Moreover, if the cargo owner proved good delivery and bad outturn as to any portion of the specific 77 bundles for damage to which recovery is sought, the shipowner would then have to establish by prooof what portion of the balance of the shipment was either delivered in bad condition or was outturned in good condition. Armco International Corp. v. Rederi A/B Disa, supra; Empresa Central Mercantil De Representacoes, LTDA. v. Republic of U.S. of Brazil, S.D.N.Y., 1957, 147 F.Supp. 778, 781, affirmed, 2 Cir., 1958, 257 F.2d 747.
 
 
 10
 To avoid ay possible misunderstanding a few additiona preliminary observations seem desirable and proper. Zack seems to have the impression that we held on the prior appeal that it had on the first trial made out a prima facie case and thus shifted the burde. We did no such thing. We merely held that detailed findings should be made 'as to all points of substance raised by the evidence.' 291 F.id at page 455. Another misconception that goes to the heart of Zack's argument on this appea, is that the purport of our decision on the prior appeal is to require the trial judge to make an affirmative finding with respect to the actua cause of the damage. No such inference may fairly be drawn from the text of the opinion; and such a requirement would fly in the face of the well settled principles of law we have just briefly set forth. If the cargo owner fails to sustain its burden, its libel must be dismissed, even if the cause of the damage found at the point of ultimate destination may still remain in nubibus. Zack also complains because the findings and conclusions do not correspond exactly with those sketched by way of illustration in the earlier opinion. It is a sufficient answer, we think, to say that the findings and conclusions now before us are adequate to dispose of all relevant issues and that there is substantial evidence to support them.
 
 
 11
 Moreover, the scope of our powers of review are not unlimited. While this is a case in admiralty, the 'clearly erroneous' principle embodied in Federal Rule of Civil Procedure 52(a) is applicable. McAllister v. United States, 1954, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20. A fair statement of the rule is that we may not set aside a finding of fact unless we are left with the 'definite and firm conviction that a mistake has been committed,' United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, and that we will reverse 'most reluctantly and only when well persuaded.' United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416, 433. We must respect the evaluation of credibility made by the trial judge of the witnesses present before him. Broadcast Music, Inc. v. Havana Madrid Restaurant Corp., 2 Cir., 1949, 175 F.2d 77, 80. As we have already held on the previous appeal in this case, we cannot distrub Judge Clancy's refusal to believe Zack's principal witness Krasnov. 291 F.2d at page 454. When we have thus given due weight to what may be deemed the effect of the demeanor of a witness upon the trial judge we are probably not at much of a disadvantage vis-a-vis the trial judge insofar as concerns documentary proof and testimony read from depositions. Iravani Mottaghi v. Barkey Importing Co., 2 Cir., 1957, 244 F.2d 238, 248, cert. denied, 354 U.S. 939, 77 S.Ct. 1402, 1 L.Ed.2d 1538; 5 Moore, Federal Practice, Section 52.03(1), pp. 2615-16 (2d ed. 1951). What this comes down to in substance is that we must take a good, hard look at the record as a whole, and when all is said and done, given the unavoidable division of function between a trial and an appellate court, we should only reverse when fairly well persuaded. See Austin v. Commissioner, 2 Cir., 1962, 298 F.id 583, 584-585; 2B Barron & Holtzoff, Federal Practice & Procedure, Section 1132, pp. 523-4 (2d ed. 1961).
 
 
 12
 We shall now examine the proofs and the finding in sufficient detail to determine whether or not each of them should stand or be set aside as clearly erroneous, and whether or not they are decisive of the case in view of the applicable principles of law above outlined.
 
 
 13
 * THERE WAS GOOD DELIVERY AT AVONMOUTH
 
 
 14
 Judge Clancy seems to have reached the conclusion that the proof of good condition on delivery to the vessel at Avonmouth was defective because the record was bare of 'proof as to how the steel sheets were cared for between Ebbw Vale and Avonmouth.' This was error. We find ample prima facie evidence of good delivery, which the shipowner has not rebutted.
 
 
 15
 Quite true, there is no direct evidence of what happened to the shipment on the 45-mile truck journey from Ebbw Vale to Avonmouth from April 16 to April 21. But a clean bill of lading was issued, Libellanths Exhibit 1, dated April 24, 1953, and this is sufficient. Carriage of Goods by Sea Act, 46 U.S.C. 1303(4). Nor is it of any avail to the shipowner to assert that the inner sheets were not visible on delivery at Avonmouth and consequently damage notations impossible. Copco Steel & Engineering Co. v. S.S. Alwaki, S.D.N.Y., 1955, 131 F.Supp. 332, 333; F. Badrena E. Hijo, Inc. v. The Rio Iguazu, supra, 182 F.Supp. at 891. The answer is that it is conceded that the inner sheets were in good condition at Ebbw Vale with the packing intact. Moisture could have reached these sheets on the trip from Ebbw Vale to Avonmouth only if the paper and the waster wrappers were torn or broken, and the bill of lading makes no mention of any such damage.
 
 
 16
 Taking into consideration the notation of trifling damage on the receipt given to the truckers, Libellanths Exhibit 4, and in the Cargo Superintendent's report, Libellant's Exhibit 3, as well as the testimony of Martin, a dock foreman employed by the independent cargo superintendent, and Irish, the first mate of the Birmingham City to the effect that he saw some bundles with broken straps and skids, but no open bundles, we think the cargo owner proved good delivery.
 
 
 17
 As evidence of broken straps and skids is found in the record, not only with reference to the period just prior to delivery at Avonmouth, but also with reference to the condition of the bundles at outturn in Hoboken, we might as well dispose of the subject now. There is proof that the lumber used for the skids proof that the lumber used for the skids to bear such large and heavy packages of steel strips. Thus there was occasion for a certain amount of extra handling and recoopering. This is the precise point at which we may discern the significance of the different methods of securing the 'MIE/D' and the 'MPD/D' bundles. Judge Clancy properly found that the breaking of a skid or skid strap (lengthwise) on a 'MIE/D' bundle would not loosen the bundle as the cross-strapping would keep the package 'firm and tightly strapped.' The critical finding is, 'because of the above described method of strapping, the affected bundles did not open or become loose.' We hold this applies as well to the delivery at Avonmouth as it does to the outturn in Hoboken.
 
 
 18
 There is no way to resolve the dispute between these parties as to the extent of the damage, if any, to the 'MPD/D' bundles not involved in this litigation. There is confusion between the 'MIE/D' and the 'MPD/D' lots in the testimony of many of the witnesses, all of which makes the resolution of the isues of fact peculiarly the function of the trial judge, who observed the demeanor of several of the witnesses and, in his comments during the trial as well as in his findings and conclusions, demonstrated a close familiarity with the proofs, testimonial and documentary.
 
 
 19
 In this state of the record it is idle for counsel for Zack to repeat ad nauseam references to the defective lumber, broken skids, recoopering and restrapping. And the same observation applies to rust on the waster sheets. These were attached for protection against moisture in any form and were commonly found in a rusted condition. This was 'normal' and in no way indicated that any moisture had reached the oiled steel strips, covered not only by the waster sheets but by the protective paper envelope as well.
 
 II
 
 20
 DESPITE THE ROUGH VOYAGE THERE IS AMPLE EVIDENCE TO SUSTAIN THE FINDING THAT THE STEEL STRIPS WERE FREE FROM DAMAGE OF ANY KIND AT OUTTURN.
 
 
 21
 The finding that goes to the heart of the case is:
 
 
 22
 '22. The libel was filed in October 1954, and libellant alleged that the shipment in suit was discharged from the vessel in an injured and damaged condition due to water contact, contact with ship's sides, appurtenances, equipment and other things aboard the vessel, and in other respects unknown to libellant. There is no credible evidence that the steel that is involved in this case was discharged from the ship either crimped, wet, rusty or in otherwise damaged condition.'
 
 
 23
 The 'MIE/D' steel was stowed in No. 4 and No. 5 'tween decks. The 'MPD/D' steel was stowed principally in No. 1 and No. 2, but also to some extent in No. 4 'tween decks. We shall not pause to describe the details of the stowage. Suffice it to say, the passage was rough, seas broke over the vesselhs decks, but the evidence supports the findings that the 'tween decks 'were clean and dry prior to loading and throughout the entire voyage,' that 'no water entered the 'tween decks or other cargo holds,' which 'were properly ventilated,' and that the 'waster sheets accumulated a coating of normal atmospheric rust during the ocean voyage.'
 
 
 24
 The only incident of any significance that occurred at sea was the shifting of the platforms on which were placed unboxed automobiles. The bundles of 'MIE/D' steel in No. 5 'tween deck were overstowed with these unboxed automobiles on wooden platforms. The shifting of these two platforms caused the breaking of the skids or straps 'on no more than six bundles' of steel 'directly beneath the automobiles.' The finding is that because of the method of strapping to which reference has already been made, 'the affected bundles did not open or become loose.'
 
 
 25
 We have read the testimony of Captain Ramsay, First Mate Irish, the stevedore supervisors Yates and Jeremy, the shipowner's pier superinetendent Anderson, as well as that of Zackhs consulting engineer Tour and other experts Warner and Cohen, the supervisor Jaskowiak of the Detroit public storer, and of Zack, libellant's president, and we have examined with minute care the documents referred to in the testimony of these witnesses, and received into evidence, including the independent surveyorhs report of Captain Briscoe, who had died before the first trial. What we find is a not unusual amount of contradictions and confusion to be found in many cargo damage cases, especially those where notice of the damage to the cargo is long delayed, as it was here. The cargo owner was obligated to prove more than a suspicion that there might possibly have been some damage to a small part of the shipment. As the trial judge frankly disbelieved at least some of Zack's witnesses, as he had good reason to reject the vague and inconclusive testimony of others as unsatisfactory, and as the documentary evidence was unreliable at best, we think it was quite proper to dispose of the basic issue of damage at outturn by finding no credible evidence that the 77 bundles of steel involved in this case were discharged from the vessel at Hoboken 'either crimped, wet, rusty or in otherwise damaged condition.' The alleged crimping was obviously an afterthought, as no reference whatever was made to crimping in the belated notice of claim to the shipowner on November 2, 1953.
 
 
 26
 Finding 22 necessarily includes a rejection of the contention so vigorously urged by the cargo owner on the previous appeal, to the effect that a tearing of the paper envelope and a breaking or displacement of the waster sheets, if such a condition existed on outturn, might have been the cause of a subsequent rusting of the inner oiled steel sheets such as was discovered at Detroit.
 
 III
 EVENTS SUBSEQUENT TO OUTTURN
 
 27
 Much of the proof now relied upon by Zack for reversal of the decree relates to what occurred after the bundles of steel strips were unloaded at Hoboken. The argument runs to the effect that the bundles were in such damaged condition at outturn that observations of a number of witnesses who handled the cargo at Weehawken should be taken as proof that the bundles were damaged at outturn in Hoboken. The most direct testimony was given by Krasnov, about which we have already commented. The difficulty with the testimony of Captain Harris and of Foligno, the Erie Railroad checker, and additional documentary evidence relative to this period, is that it is subject to the same infirmities as we have already found in the proofs adduced by the cargo owner concerning conditions found to exist at Hoboken.
 
 
 28
 The record discloses numerous collateral issues, such as the amount of rain or lack of rain during some of the various loadings and unloadings of the bundles of steel sheets, and the use of wire slings, rollers, dollies and fork lifts during the discharge of the cargo at Hoboken. We think it not necessary to comment on these issues and other peripheral matters.
 
 
 29
 The shipownerhs motion to assess Zack with the costs of the prior appeal, already paid by the shipowner, is denied. The reversal was based not only on the inadequacy of the findings but also on several erroneous rulings on matters of law, as we have already pointed out. Moreover, the shipowner could have protected the record of dismissal by requesting the trial judge to make appropriate and adequate findings for purposes of review.
 
 
 30
 Affirmed.