**ASSOCIATED METALS & MINERALS CORPORATION, Plaintiff,**

v.

**M/V PAN DYNASTY, her engines, boilers, etc. and Pan Ocean Bulk Carriers, Ltd., Defendants.**

**Civ. A. No. 82–5646.**

United States District Court, E.D. Louisiana.

July 3, 1984.

Stanley McDermott, III, New Orleans, La., for plaintiff.

M.D. Yager, New Orleans, La., for defendants.

CASSIBRY, Senior District Judge.

In this maritime cargo claim plaintiff Associated Metals & Minerals Corporation seeks recovery of $57,566.56 for physical damages (denting, chipping, flattening) to a shipment of steel pipe carried aboard the M/V PAN DYNASTY from the Port of Buson, Korea to the Port of New Orleans, Louisiana in October-November 1981 against defendant Pan Ocean Bulk Carrier, Ltd., owner and/or operator of the PAN DYNASTY. Plaintiff, purchaser of the clean bill of lading for the shipment contends that the damage occurred during the ocean voyage. The defendant admits that some damage to the steel pipe was evident when the pipe was offloaded in New Orleans, but contends that plaintiff's proof is insufficient to show the extent of the damage or its value, relying on plaintiff's alleged inability to prove that some of the damage did not occur in handling the shipment during its transportation to its ulti-

mate inland destination, Newark, Ohio. On the trial of this case the plaintiff sustained its burden of proof to show that damage to the steel pipe occurred on the ocean voyage, and has further shown that none of the damage occurred during its transportation to Ohio. Pursuant to Rule 52(a), the Court now enters the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. Plaintiff, Associated Metals & Minerals Corporation, in October 1981, purchased for value and became the holder in due course of Pan Ocean Bulk Carriers Ltd.'s M/V PAN DYNASTY Buson/New Orleans bill of lading No. BUNOL–329, dated October 7, 1981. This bill of lading had been issued by defendant Pan Ocean Bulk Carriers, Ltd. ("Pan Ocean") to Kukje Corporation, the shipper, and covered 627 joints (209 lifts) of prime steel pipe. The bill of lading was "clean", no exceptions to the pipe's apparent good order and condition having been entered by Pan Ocean on the face of the bill of lading in Busan at the time of shipment.

2. The PAN DYNASTY, operated by defendant Pan Ocean, with the pipe cargo on board, sailed from Buson to New Orleans, arriving on or about November 25, 1981. The 209 bundles of pipe were bottom-stowed in the after part of the vessel's # 4 cargo hold, beneath a shipment of 505 bundles of pipe (weighing 577 metric tons) also destined for New Orleans discharge. Other top-stowed cargo had been discharged from the # 4 hatch at earlier ports of call.

3. Albert Ross, a surveyor retained by Cooper Stevedoring Company, Inc. ("Cooper"), the stevedore hired by Pan Ocean to discharge the New Orleans cargo, boarded the vessel in New Orleans to inspect the cargo in stow. In the # 1 hold Ross observed bottom-stowed pipe with ends pressed into the after bulkhead and dunnage timbers generally broken and compressed into pipe walls. In the # 4 hold, where plaintiff's cargo was bottom-stowed, Ross observed stowage conditions similar

to the conditions in the #1 hold. Regarding the pipe shipped under bill of lading BUNOL–329, Ross found the walls of numerous joints indented and/or compressed and ends gouged.

4. Cooper discharged this pipe shipment into Barge ML 807, operated by River Forwarders, Inc. River Forwarders then issued its New Orleans/Cincinnati barge bill of lading dated November 27, 1981. The bill of lading recited the following exceptions:

All pipe shows various amounts of rust. Scuffs and scratches. Some chips and dents on the edges. Some broken or loose wire bands. Some pipe edges show slight out of roundness.

The exceptions were based on observations of the cargo by River Forwarder's barge inspector, David Landry, at the time of loading. The pipe was stowed in the midships section of the barge's hopper, between cargo previously loaded fore and aft. No cargo was top-stowed over the pipe in the barge.

5. River Forwarders thereafter moved the Barge ML 807, with this pipe cargo aboard, to Cincinnati River Terminal in Cincinnati, Ohio. Plaintiff had engaged the terminal to discharge the pipe from the barge onto flat-bed trucks for transportation to Mutual Oil Field Supply in Newark, Ohio, to whom plaintiff had contracted to sell the pipe.

6. Homer Owens, Cincinnati River Terminal's manager, supervised the discharge of the pipe from the barge on December 16 and 18, 1981. When the barge arrived, Owens noticed that the pipe was damaged. Notations were made on the terminal's receipts accordingly to show "some pipes scuffed gouged flat places end pcs. missing rusted." The flat places were found along the pipe lengths. In Owens' opinion, the damage had not resulted from the barge stow, but rather had occurred during handling and/or stowage before barge loading in New Orleans. No damage to the pipe occurred during the barge unloading at the terminal.

7. Owens also supervised the loading of the pipe onto the trucks. Fifteen joints, in three tiers of five joints each, were loaded onto each truck. The tiers were separated by dunnage timbers placed uniformly at four intervals along the pipe lengths. The pipe was securely lashed to prevent in-transit shifting. The pipe was suitably loaded onto the trucks to avoid the likelihood of further damage.

8. The pipe was inspected at Mutual Oil Field Supply's Newark, Ohio yard by Russell Frank, a surveyor of Toplis and Harding, Inc. The pipe was stacked evenly with dunnage between tiers. Frank noticed damage along pipe lengths and on ends. Following Mutual's segregation of damaged and undamaged pipe, Frank determined that the walls of 335 joints were damaged. These lengths were subsequently sold for salvage to the highest bidder. The salvage sale yielded a return of $28,145.56.

9. The pipe was also inspected in Mutual's yard by M.W. Fisher, a surveyor retained by Pan Ocean's interests. Fisher examined a representative portion of the shipment, finding approximately 43% of the examined pipe to be damaged. Fisher's estimate of the damaged pipe is substantially consistent with Frank's findings following the segregation of all damaged and undamaged pipe. The damage consisted of impacts to ends and flat places and/or dents along the lengths. The receiver's principal concern was with the flat places and/or dents along the walls, rather than with the end damage. The flat places and/or dents were largely consistent with imprints (3.5" wide) along the lengths. These imprints resulted from dunnage compression in stow aboard the PAN DYNASTY. Although Fisher expressed the view that a portion of the wall damage was not consistent with dunnage compression, no other explanation appears more likely from the evidence adduced at trial. The Court concludes that wall damage occurred on board the vessel.

10. The market value of similar-grade pipe in the U.S. Gulf in the last quarter of 1981, when the PAN DYNASTY discharged the subject cargo, was approxi-

mately $600.00 per 100 ft., slightly less than Associated's $642.18 contract price to Mutual. Applying this market value to the pipe, the sound market value of the 335 damaged joints at the time of delivery in New Orleans was $80,400.00. Considering the salvage return, plaintiff sustained a loss of $52,254.44.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of this maritime claim, and venue is properly laid in the Eastern District of Louisiana.

2. This action, involving carriage of cargo from a foreign port to a United States port, is governed by the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 *et seq.*

3. Pan Ocean, having issued the subject bill of lading, is a COGSA carrier. 46 U.S.C. § 1301(a).

4. A cargo owner such as plaintiff establishes a *prima facie* case of carrier liability by establishing the good order and condition of the cargo at the port of shipment and bad order and condition at the port of destination after the carrier has discharged and delivered the cargo. *Blasser Bros. v. Northern Pan-American Line,* 628 F.2d 376, 381 (5th Cir.1980).

5. A clean bill of lading is *prima facie* evidence that the carrier received the cargo in good condition. *Blasser Bros. v. Northern Pan-American Line, supra; Associated Metal & Minerals Corp. v. M/V RUPERT DE LARRINAGA,* 581 F.2d 100, 101 (5th Cir.1978). A plaintiff's *prima facie* case of delivery of the cargo to the carrier in good order is satisfied by the introduction into evidence of the clean bill of lading. *Emmco Ins. Co. v. Wallenius Caribbean Line S.A.,* 492 F.2d 508, 513 (5th Cir.1974).

6. Plaintiff has established a *prima facie* case of liability. A clean bill of lading was issued at the loading port and the cargo was discharged and delivered in damaged condition in New Orleans, the port of discharge. The apparent cause of the indentation of the pipe walls was dunnage compression resulting from the weight of top-stowed cargo in the PAN DYNASTY's # 4 cargo hold. The apparent cause of end damage was improper stowage and/or mishandling during loading or discharge.

7. Once a cargo owner has presented a *prima facie* case, the carrier has the burden of proving that the harm was occasioned by one of the excepted causes set forth in 46 U.S.C. § 1304(2). *Blasser Bros. v. Northern Pan-American Line, supra; Horn v. Cia de Navegacion Fruco S.A.,* 404 F.2d 422, 435 (5th Cir. 1968).

8. Furthermore, once the cargo owner has presented its *prima facie* case, the carrier will be liable for the full loss unless it proves what portion of the cargo was not actually damaged or was damaged due to an excepted cause under § 1304(2). *Blasser Bros. v. Northern Pan-American Line, supra; J. Gerber & Co. v. Sabine Howaldt,* 437 F.2d 580, 588 (2d Cir.1971); *Swedish American Lines v. Evans Product Co.,* 431 F.2d 869, 870 (4th Cir.1970).

9. In addition, if an ocean carrier contends that damage occurred after it delivered the cargo to an on-carrier, the ocean carrier bears the burden of proving that the on-carrier caused additional damage for which the ocean carrier would not be liable. *Calmaquip Eng. West Hemisphere v. West Coast Carriers,* 650 F.2d 633 (5th Cir.1981); *Swedish American Lines v. Evans Products Co.,* 431 F.2d 869 (4th Cir. 1970).

10. Pan Ocean has offered no proof that the subject wall damage resulted from an excepted cause under § 1304(2). The carrier has thus not rebutted plaintiff's *prima facie* case. The evidence further indicates that the wall damage occurred due to improper stowage, a breach of § 1303(2).

11. Pan Ocean has not proven that any portion of the damage occurred during barge or truck on-carriage. Having failed to sustain this burden, defendant is liable for plaintiff's full loss. *Armco Intern. Corp. v. Rederi A/B Disa,* 151 F.2d 5 (2d Cir.1945). On the contrary the plaintiff has shown that the damage did not occur during barge or truck on-carriage. The

Court, moreover, after hearing the testimony of the witnesses and reviewing the photographs and documents offered into evidence, has concluded that the wall damage resulted from stowage compression aboard the ocean vessel. Plaintiff has amply shown that stow and/or dunnage compression aboard the PAN DYNASTY caused damage to the walls of the pipe. Pan Ocean has not proven by a preponderance of the evidence that it is more likely than not that any appreciable portion of the wall damage resulted from causes other than stowage and/or dunnage compression aboard the ocean vessel.

12. If a carrier contends that a cargo owner has not acted reasonably to mitigate its damages, the carrier bears the burden of proving that fact. *Emmco Ins. Co. v. Wallenius Carribbean Line*, 492 F.2d 508 (5th Cir.1974). No such proof was shown in this case. The Court concludes that the salvage sale was fairly conducted and that plaintiff properly mitigated its loss.

13. The proper measure of recovery is the difference between sound market value and damaged value. *St. Johns N.F. Shipping Corp. v. S.A. Companhia Geral*, 263 U.S. 119, 44 S.Ct. 30, 68 L.Ed. 201 (1923). Plaintiff's loss accordingly amounts to $52,254.44, for which it is entitled to judgment against defendant.

14. Pre-judgment interest is awarded in property damage cases such as this absent a showing of exceptional circumstances. *Mitsui & Co. v. Amer. Export*, 636 F.2d 807, 1981 A.M.C. 331, 355–7 (2d Cir.); *Gator Marine Service Towing Inc. v. J. Ray McDermott & Co.*, 651 F.2d 1096 (5th Cir.1981); *Complaint of M/V VULCAN*, 553 F.2d 489 (5th Cir.1977). The Court will accordingly award plaintiff pre-judgment interest from November 25, 1981, the date of the vessel's arrival in New Orleans.

The Clerk shall prepare judgment accordingly.