**GENERAL FOODS CORPORATION** et al.
**v. THE TROUBADOR** et al.

**GREAT ATLANTIC & PACIFIC TEA CO.**
et al. v. THE TROUBADOR et al.

United States District Court
S. D. New York.

March 21, 1951.

Hill, Rivkins & Middleton, New York City, Proctors for Libelants, by A. O. Louis, New York City, M. F. Walsh, Brooklyn, N. Y., advocates.

Irving H. Saypol, U. S. Atty., New York City, Proctor for United States of America (War Shipping Administration) Cosmopolitan Shipping Co., Inc., and Moore-McCormack, Lines by Horace M. Gray, New York City, advocate.

Burlingham, Veeder, Clark & Hupper, New York City, Proctors for United Fruit Company, by H. M. Lord, R. A. Feltner, New York City, advocates.

GODDARD, District Judge.

These consolidated suits seek to recover for loss and damage to shipments of bagged coffee from Santos, Brazil, to New York

City in the S. S. Troubador, a vessel that was owned, operated, managed and controlled during the voyage involved in this action by the respondent United States. Both libels have been dismissed without costs by consent as to United Fruit Co., Cosmopolitan Shipping Co., Inc., and Moore-McCormack Lines, Inc.

The vessel left Santos on March 18, 1943 and did not arrive in New York City until June 30, 1943.

The Troubador was a coal burning vessel built in 1919. She had a top speed of six or seven knots under normal conditions, but because of numerous breakdowns resulting in lost speed and delays for calls at various ports for repairs and further delays waiting for convoys to form, this voyage that would ordinarily take this vessel about one month took 104 days.

When the ship's hatches were opened in New York, it was found that the coffee had bleached and swelled so that the bags were pressed against the deck beams and up about two feet into the squares of all hatches. Many of the bags and the twine with which the bags were sewn had rotted. This, plus the swelling of the coffee, caused many bags to burst and spill all or parts of their contents. According to the ship's stowage plan, 91,634 bags were loaded at Santos. The surveyor, who acted for the ship and carrier, reported that on shipments totalling 91,387 bags, 11,429 were slack and 2,298 were empty.

The libelants' claims are for (1) shortage of whole bags of coffee; (2) slackage from torn or burst bags; (3) actual physical damage to coffee delivered; and (4) the loss sustained by reason of the difference in the value of the coffee delivered to the respondent at Santos in intact bags and the lesser value of the bags of sweepings containing coffee and foreign matter substituted by the respondent to offset the shortage and slackage.

Under the Carriage of Goods by Sea Act, 46 U.S.C.A. §§ 1303, 1304, if the shipper proves that his goods were loaded in good condition and outturned damaged, the carrier, in order to avoid liability, must prove (1) that the harm resulted from an "excepted cause" for which the carrier was not liable, or (2) that it exercised due diligence to avoid and prevent the harm. American Tobacco Co. v. The Katingo Hadjipatera, D.C., 81 F.Supp. 438.

The respondent carrier has raised as a defense the contention that there was an inherent vice or quality in the coffee when it was loaded aboard the vessel. When the defense of inherent vice is raised, it brings into issue the good condition of the goods when shipped. The Niel Maersk, 2 Cir., 91 F.2d 932, certiorari denied, 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582; American Tobacco Co. v. The Katingo Hadjipatera, supra.

The respondent has offered no convincing evidence in support of its contention. The respondent asserts that the coffee was "old crop" [prior to the current or new crop]; that the expansion was the natural result of the aging of the coffee: However, experts testified at the trial that the difference between current and old crop coffee in both weight and bulk is almost imperceptible. It is apparent that the great expansion in the coffee here in such a relatively short time must be from another cause.

The bills of lading recite that the coffee when loaded was in "apparent good order and condition". The coffee was shipped under the supervision of the Brazilian Government's coffee control organization. There was much testimony that, when loaded, the coffee was not swollen; that the bags were of the type customarily used; the bags were dry and not torn, burst or rotted, and that the coffee was loosely bagged. Despite very rough handling, only a very few bags burst during loading.

The fact that approximately 80,000 bags out of approximately 91,000 bags were outturned in good condition is some evidence that the entire cargo was in good condition when loaded. Cargo Carriers, Inc., v. Brown Steamship Co., D.C., 95 F. Supp. 288, 1950 A.M.C. 2046.

After careful consideration of all the testimony, I am satisfied that the coffee was in good condition when loaded aboard the Troubador.

It is undisputed that some of the coffee outturned in a damaged condition and since the respondent did not show that the damage was the result of an excepted cause, it is incumbent upon the respondent carrier to show that it exercised due diligence to avoid the damage.

The libelant contends that the S.S. Troubador was not seaworthy. However, under the Carriage of Goods By Sea Act, 46 U.S.C.A. § 1300 et seq., neither carrier nor ship is liable for loss resulting from unseaworthiness unless caused by a failure to exercise due diligence to make the ship seaworthy. Ore Steamship Corporation v. D/S A/S Hassel, 2 Cir., 137 F.2d 326. It appears that the carrier did exercise such due diligence in this case.

Due diligence is that diligence which a competent vessel owner would or should exercise under the circumstances. The Bill, D.C., 47 F.Supp. 969. The S.S. Troubador was reconditioned in 1941–1942 and received a seaworthy certificate from the American Bureau of Shipping in December, 1942. New boilers were installed by a reputable marine boiler maker. In December, 1942, the vessel was drydocked and extensive voyage repairs were made in Philadelphia. Voyage repairs were made at New York and Norfolk just prior to the voyage to Santos. At Santos voyage repairs were made and the classification surveyor surveyed her holds and declared her to be seaworthy and "fit to carry dry and perishable cargo". I think respondent has shown it did exercise due diligence to make the vessel seaworthy. However, the respondent also has the burden of showing that it was not negligent in handling, caring for, and stowing the cargo. I think it has not sustained this burden.

The fact that approximately 13,500 bags were found at the outturn to have burst because they were wet and rotted and the coffee had expanded after all of them had been dry and intact when loaded is, in the absence of other adequate causes, an indication of the lack of care on the part of the carrier in the handling of the cargo. Asiatic Prince, D.C., 103 F. 676.

Raw coffee requires dry storage and considerable ventilation. In "Modern Ship Stowage", published by the United States Department of Commerce in 1942, it is stated at page 335: "When carried as part of a mixed general cargo, coffee should be stowed away from heat or moist cargo; * * * and goods likely to heat and sweat. The ventilation should be carefully attended to throughout the voyage to keep the coffee beans dry and prevent deterioration."

Respondent knew or should have known that this cargo of coffee should be stowed free from moist cargo or leakage and that constant care should be exercised to provide the required ventilation for under favorable conditions the voyage to New York would take at least thirty days through warm waters. After the numerous breakdowns of the machinery and the other delays that resulted in an unusually long voyage, even greater care was called for. I think that the respondent failed to exercise the care or adopt the precautions which the situation required.

Prior to loading the coffee, the respondent loaded 1,000 tons of zirconium ore—a large quantity of it in powdered form—in the same holds in which the coffee was later stowed. There was expert testimony to the effect that under ordinary circumstances this is bad stowage because of the possibility of dampness of the ore raising the moisture content of the hold. In this case, the ore was actually wet when put in the hold for it was loaded during a heavy rainstorm. Wet bags of cocoa beans were also loaded in No. 3 hatch with coffee.

The coffee was stowed solid—that is, it formed a solid block up to within 6 to 12 inches of the deck beams, and no space was left for the circulation of air. The temporature of the holds and cargo was not checked during the voyage although it is the general custom to do so. During the voyage, steam was observed coming out of one of the holds.

Captain Lynner, the surveyor for the carrier, admitted that after the hatches were removed he made temperature tests throughout the stow; the temperature of the sound bags of coffee ranged up to 104

degrees and the temperature of some of the stained and wet bags was as high as 120 degrees.

The libelants contend that the method of ventilation used was wrong. Experts called by libelants testified that the only proper way to trim a ship's ventilators is to turn the windward ventilators away from the wind and the lee ventilators into the wind. They also cited text books on stowage for the same proposition. The Troubador's ventilators were either all trimmed into the wind or the windward ventilators were trimmed into the wind and the lee ventilators away from the wind. The hatch covers were never raised. I do not now say that the trimming of the ventilators in the manner advocated in the testimony of libelants' experts is the only satisfactory method. But the means and method of ventilation provided by the respondent were not adequate under the existing conditions.

The respondent certainly has not sustained the burden of proving that it took all the precautions to protect the cargo that a careful or prudent carrier would have taken. The respondent's failure to do so was the proximate cause of the damage to the cargo.

Some 400 bags of coffee in hold No. 5 were found to be wet from leakage from a sanitary line. The respondent contends that it exercised due care to prevent such harm as all holds were inspected in Santos. However, the inspection was merely a visual one and rather a superficial one. The burden of proving due care is not sustained by such an inspection. See The Southwark, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65. Moreover, the respondent should have foreseen the possibility of a leak from this sanitary line in this old vessel during a long sea voyage even if an inspection had been made prior to the voyage. It was hazardous to stow cargo like raw coffee that would be damaged by exposure to moisture in a space where the danger of such a leak was present. Sanib Corporation v. United Fruit Co., D.C., 74 F.Supp. 64.

Respondent claims that the libelants suffered no damage because of delivery to libelants of sweepings to offset the shortage and slackage. However, the libelants rejected some of the sweepings because of their dirty and damaged condition and were unable to sell the rest at better than a depreciated price. The respondent cites two paragraphs of the bill of lading in support of his argument. These paragraphs provide as follows:

"13. * * * Goods that cannot be identified as to marks or numbers, cargo sweepings, liquid residue and any unclaimed goods not otherwise accounted for shall be allocated for completing delivery to the various consignees of goods of like character, in proportion to any apparent shortage, loss of weight, or damage. Loss or damage to goods in bulk stowed without separation from other goods in bulk of like quality, shipped by either the same or another shipper, shall be divided in proportion among the several shipments."

"23. If any bagged or baled goods are landed slack or torn, receiver and/or consignee shall accept its proportion of the sweepings. Ship not responsible for loss of weight in bags or bales torn, mended or with sample holes."

It is apparent that the purpose of these paragraphs was to provide for allocation among the various shippers of sweepings. They do not mean that the carrier could exculpate itself from all liability by delivering sweepings in the place of full, intact bags. The custom of the shipping business at the time in question was to deliver sweepings to those consignees who would accept them. Any loss was borne by the carrier.

Moreover, even if the purpose of the two paragraphs was as respondent urges, they would be rendered null and void by Section 1303(8) of the Carriage of Goods by Sea Act, which provides: "Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties

212

and obligations provided in this section, or lessening such liability otherwise than as provided in this chapter or section 25 of Title 49, shall be null and void and of no effect. * * *"

Decree for libelants against United States of America [War Shipping Administration] for their damages with interest and costs. Computation of the damages will be referred to a Commissioner.

Settle decrees on notice.

Libelants to submit upon notice proposed findings of fact and conclusions of law.