**INLAND WATERWAYS SHIPPERS ASSOCIATION, INC., et al., Plaintiffs,**

v.

**MISSISSIPPI VALLEY BARGE LINE COMPANY, Defendant.**

**No. 57 C 136(3).**

United States District Court
E. D. Missouri, E. D.
July 1, 1960.

Finley, Lucas & Arnold, St. Louis, Mo., for plaintiff.

Thompson, Mitchell, Thompson & Douglas, St. Louis, Mo., for defendant.

WEBER, District Judge.

This cause was tried before the Court, without a jury, and at the conclusion of the trial was passed for filing of briefs

Extension of time on the filing of briefs was granted at the request of parties and thereafter the matter was submitted and the Court now having heard the testimony and having examined the briefs of counsel, and being fully advised herein does find as follows:

### Facts on Count I

In 1954 plaintiff L. F. Foster Company, hereinafter referred to as Foster, purchased 620 bundles of new galvanized 1 and 1¼ inch fence pipe from the Saw Hill Tube Company of Sharon, Pennsylvania. Foster employed plaintiff Inland Waterways Shippers Association, Inc., hereinafter referred to as Inland, to arrange for the transportation of this pipe from the manufacturer's plant to Foster's plant in Houston, Texas. All shipping arrangements were made by Inland, who was billed and who in turn billed Foster.

The new galvanized pipe was loaded onto a railroad car of the Erie Railroad at Sharon, Pennsylvania, which transported the load to Pittsburgh, Pennsylvania, where it was unloaded from the railroad car and placed onto defendant's barge CTC–412, hereinafter referred to as Barge 412, between July 12 and July 16, 1954. Defendant had no loading facilities at Pittsburgh and the loading was done by Marion Coal and Transfer Company, hereinafter referred to as Marion. Marion's loading dock was opposite defendant's fleet at the river harbor in Pittsburgh and they had arrangements whereby defendant notified Marion and Marion would arrange with the shipper as to the place of loading and the shipper arranged for the stevedores to actually do the loading.

The above shipment was placed in Barge 412, an open hopper barge, and towed by defendant to Cincinnati, Ohio, where it was placed at defendant's terminal. No covering had been placed over the cargo and it was exposed to the weather. Such type of shipping for galvanized pipe was customary and proper because galvanized pipe is not harmed by exposure.

On July 27, 1954, under direction and supervision of defendant's terminal manager, 281,990 pounds of old, rusty, muddy, dirty pipe was placed aboard Barge 412, a portion of which was admittedly placed above and on the galvanized pipe in question. This load will hereinafter be referred to as old pipe and belonged to Foster, who had purchased it at Cincinnati and delivered it to defendant for shipment to Foster's plant at Houston, Texas, the same plant to which the galvanized pipe was to be delivered. Defendant did not learn of this shipment until after Barge 412 was loaded and had left Pittsburgh. No covering was placed over the galvanized pipe before loading the old pipe and the entire shipment was completed in the open hopper barge.

On August 10, 1954, defendant delivered Barge 412, with its combined cargo, at New Orleans, Louisiana. Another carrier transported it from New Orleans to Houston, Texas, where it was again received by defendant, unloaded and placed aboard a Missouri Pacific Railroad car which moved it about sixteen miles to the Pasadena Fence Company, Pasadena, Texas, who had purchased the pipe from Foster while the shipment was enroute. Pasadena's employees removed the shipment from the railroad car and transported it by truck about one quarter mile, during which shipment it was noted that the galvanized pipe was covered with stains caused by rust drippings. Pasadena notified Foster of this defect, the shipment was examined by a cargo surveyor who testified that the rust stains had been on the pipe for a period in excess of 30 days or longer and that the pipe was in good condition except where it had been stained by rust.

Testimony showed that the galvanized pipe in question, in good condition, was worth $8,525.57, but that in its stained condition it was worth only $3,100. Plaintiff's proof showed that $3,386.31 was expended to re-galvanize the pipe in question and plaintiff's prayer is for that amount, which is less than the difference between the value of the pipe in good

condition and its value in the condition delivered.

The testimony further showed that the weather was foggy and wet during the time the shipment left Cincinnati, Ohio, and arrived at Houston, Texas. The weather conditions were favorable from the time the shipment was at Houston, Texas, and until it reached the plant in Pasadena.

### Facts on Count II

Foster purchased electric-weld pipe from Youngstown Sheet and Tube Company in 1955 and employed Inland to arrange transportation from the manufacturer's plant to Foster in Houston, Texas. Inland made arrangements with defendant for the river shipment, the shipment first being loaded on railroad cars at Youngstown, Ohio, from where it was transported to Pittsburgh, Pennsylvania, and placed onto defendant's Barge MV–618, hereinafter referred to as Barge 618. Barge 618 was loaded by Marion in the same manner as contained in the facts concerning Count I, and further portions of the shipment were also loaded in defendant's Barge 401. The shipment in Barge 618 is the only one involved in this count and left Pittsburgh about May 18, 1955.

Barge 618 arrived at New Orleans, Louisiana, June 9, 1955, and was transported from there to Houston, Texas, by another water carrier and was tendered to Inland, unloaded and placed aboard railroad cars and moved to Foster's plant.

At its arrival there it was inspected and dents were found in the walls of 43 pieces of pipe. The damages were surveyed and these dented pieces were found to be unusable and had to be re-conditioned by cutting out the dented portions and selling for scrap, resulting in a loss of $2,986.85. This damage was to pipe contained in Lot 9 (29 pieces), Lot 10 (35 pieces) and Lot 11 (29 pieces). (See plaintiff's Exhibit 12 for the position of Lots 9, 10 and 11 in Barge 618.)

Lots 9, 10 and 11 aforesaid were delivered to defendant's barge in Pittsburgh from several railroad cars and likewise would have required several railroad cars to move it from Houston to Foster's plant by rail. 43 pieces of pipe contained in the above three lots were found to be damaged with dents averaging 24 feet in length and therefore the same type of damage was discovered on lots loaded in more than one railroad car.

Plaintiff's Exhibit 12 further shows that Lots 12 and 13 were placed on top of Lots 9, 10 and 11 in Barge 618. The testimony shows that Lots 12 and 13 weighed 204,090 pounds and included 22 bars weighing 4,209 pounds each. The testimony further shows that defendant's witness Schiffman gave his expert opinion that the damage in question occurred as a result of improper stowage.

Plaintiff's Exhibit 12 further shows that the entire shipment contained in Barge 618 was listed and diagramed as to content and position in the barge and is from the records of defendant. In other words, defendant made up plaintiff's Exhibit 12, and in making it up defendant showed damages to Lot 20, but not as to any of the remaining lots. Plaintiff's Exhibit 12 was prepared at the time the shipment was received from the railroad at Pittsburgh and placed in defendant's barge.

The testimony further shows, by defendant's own prepared diagram (plaintiff's Exhibit 12) that at the time the shipment was received one lot, to wit, Lot 20, was damaged. Therefore, the Court's factual conclusion is that all other lots were received by defendant in proper order.

Plaintiff offered testimony that Barge 618 ran aground on June 4, 1955, but the testimony herein discloses that if such grounding was sufficient to cause the damage complained of, the force of the grounding would have been evident upon the barge itself. It is the factual conclusion of this Court that the damage to the electric-weld steel pipe in question in this count was the result of improper

stowage upon Barge 618 by the placement of the 204,090 pounds of weight in Lots 12 and 13 upon the pipe in question.

### Conclusions

■ Defendant here was not the initial carrier and therefore does not come under the provisions of the Carmack Amendment, § 20(11), Title 49, U.S.C.A., regardless of the bill of lading or otherwise. Beard v. St. Louis A. & T. H. Ry. Co., 79 Iowa 527, 44 N.W. 803; Watterson v. New York Cent. Ry. Co., 6 Cir., 235 F.2d 114.

In this cause railroads were the initial carriers in both Counts I and II.

■ The burden is upon the shipper to show that goods were delivered in good order. The Solveig, 9 Cir., 217 F. 805.

■ When an initial carrier is not involved under the Carmack Amendment aforesaid, all subsequent carriers are in the category of connecting carriers and a connecting carrier has a common law duty with regard to shipments it receives. Ogdensburg & L. C. R. Co. v. Pratt, 22 Wall. 123, 89 U.S. 123, 22 L.Ed. 827. This applies to water carriers. The Maggie Hammond, 9 Wall. 435, 76 U.S. 435, 19 L.Ed. 772. This common law duty cannot be abrogated by exceptions in the bill of lading. §§ 190, 191, Title 46, U.S.C.A.

■ It is the common law duty of a carrier to exercise such reasonable care as is required under the circumstances to protect a shipment from injury during transportation. United States v. Marshal, 9 Cir., 230 F.2d 183; Hamilton Mfg. Co. v. Chicago and N. W. Ry. Co., D.C., 176 F.Supp. 546; 13 C.J.S. Carriers § 421, p. 919. See also General Food Corp. v. The Troubador, D.C., 98 F.Supp. 207.

■ If shipment was in good condition when delivered to the carrier and damage is discovered when received by the shipper, the shipper has made a prima facie case. Hamilton Mfg. Co. v. Chicago & N. W. Ry. Co., supra.

■ When a shipper has a non-rustable product and establishes by evidence that it was placed in the bottom of the carrier's barge; and further shows that rusty, dirty, old steel pipes were placed on top of that cargo without protection; and further shows that thereafter the weather was wet and foggy while in transit on the barge; and that subsequent thereto the non-rusting galvanized pipe was never subjected to the same exposure and conditions; and, when such shipper is only claiming rust damage, such shipper has not only made a prima facie case but has sustained the burden of proof required in that defendant was negligent in failing to use reasonable care, under the circumstances, to protect the shipment from injury during transportation.

■ Where a shipper produces the carrier's barge loading diagram, which contains a notation by the carrier that one lot of the shipment was damaged, the shipper has satisfied the burden of proof required to show that the remainder of the lots being shipped were received in good condition. This burden is further satisfied when the record and testimony discloses that heavy weight was placed on top of the lots claimed to be damaged and the damage was such as could not have been caused by rail transportation after leaving the possession of the carrier in question.

■ Regardless of what individual or company does the actual manual loading of a barge, a water carrier cannot avoid its common law and statutory duty to properly load, stow and discharge the cargo. Therefore, it makes no difference whom the stevedores were representing, the duty to properly load and use reasonable care in the transportation of the cargoes in question rested upon the defendant.

■ It is finally concluded as to both counts herein that the damages caused to the shipments in question therein were due to the lack of care and on account of negligence of defendant carrier in failing to exercise proper care in

protecting the cargoes in question during transportation. Plaintiffs should recover on both counts and judgment will be entered in their favor and against defendant.