LEVATINO COMPANY, Inc., Plaintiff,

v.

M/S HELVIG TORM, her engines, etc.,
and

D/S Torm A/S, Defendant,
and

John W. McGrath Corporation,
Defendant-Impleaded.

No. 61 AD 496.

United States District Court
S. D. New York.

Sept. 19, 1968.

Bigham, Englar, Jones & Houston, New York City, for plaintiff; F. Herbert Prem, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendant; M. E. De-Orchis, LeRoy S. Corsa, New York City, of counsel.

McHugh & Leonard, New York City, for defendant-impleaded; Martin J. Mc-Hugh, Maurice F. Beshlian, New York City, of counsel.

COOPER, District Judge.

Plaintiff, a New York corporation, instituted this action in admiralty[1] to recover for shortage and damage to seven

---

1. Paragraph Seventh of the complaint states: "Libellant was the ultimate consignee and owner of the shipments * * * and brings this action on its own behalf, and on behalf of and for the benefit of all parties who may be, or may become, interested in the said shipments, as their respective interests ultimately may appear."

shipments of Spanish melons,[2] comprising 12,846 wooden cases, delivered to defendant D/S Torm A/S, a Danish steamship company doing business as a common carrier under the trade name of Torm Lines, at the Port of Alicante, Spain, for transportation to the Port of New York on board defendant's vessel the Helvig Torm. Defendant impleaded John W. McGrath Corporation (hereinafter McGrath), the discharging stevedore, asserting its right to indemnification for any liability imposed on it as a result of McGrath's negligence.

■■■ The action is within the admiralty jurisdiction of this Court. 28 U.S.C. § 1333. The rights of the parties being governed by the Carriage of Goods by Sea Act (hereinafter COGSA), 46 U.S.C. § 1300 et seq., and the Harter Act, 46 U.S.C. § 190 et seq. COGSA covers the period "from the time when the goods are loaded on to the time when they are discharged from the ship." 46 U.S.C. § 1301(e). The Harter Act is applicable to "the period between the discharge of cargo from the vessel and its proper delivery." Caterpillar Overseas S. A. v. S.S. Expeditor, 318 F.2d 720, 723 (2d Cir.), cert. denied, 375 U.S. 942, 84 S.Ct. 347, 11 L.Ed.2d 272 (1963); Levatino Co. v. American President Lines, 233 F.Supp. 697 (S.D.N.Y.), aff'd, 337 .F.2d 729 (2d Cir. 1964); Isthmian Steamship Co. v. California Spray-Chemical Corp., 290 F.2d 486 (9th Cir. 1961).

■■■ There is no substance to the contention that Levation Company, Inc. (hereinafter Levatino) lacks standing to sue. Regardless of the precise terms of the arrangements between Levatino and the Spanish shippers, it is well established that the former advanced between $1.90 and $2.00 per case to each of the shippers.[3] These monies have not been repaid. Accordingly, plaintiff has a substantial financial interest in the outcome of this litigation having itself sustained an actual loss as a result of delivery of the melons in damaged condition.[4] Cf. Compagnie De Navigation

2. The following shippers delivered to defendant at the Port of Alicante various consignments of melons for carriage on the Helvig Torm to the Port of New York, there to be delivered to the following consignees in accordance with the valid terms and conditions of seven certain bills of lading signed and delivered to the said shippers by the duly authorized agent and representative of defendant and of Helvig Torm:

| B/L No. | Shipper | Quantity of Melons | Consignee |
|---|---|---|---|
| 9 | Jose Canovas Pardo, S.L. | 2338 cases | American Trust Co. |
| 18 | " | 2490 " | " " |
| 21 | Juan Pelegrin Tomas | 1000 " | " " |
| 17 | A. Sanchez Marin y Cia. | 3394 " | Order of Shipper |
| 20 | Vincente Garcia Canales | 1624 " | American Trust Co. |
| 12 | Jose Lopez Arce y Cia., S.L. | 1500 " | " " |
| 10 | Jose Garcia Sanchez | 500 " | " " |

(Pre-Trial Order, December 16, 1964, p. 2)

3. Such sums were advanced under letters of credit opened with American Trust Company (deposition of Stephen Levatino, Ex. 13, p. 4).

It is to be noted that the shipment forwarded by A. Sanchez Marin y Cia, under B/L #17, was an outright purchase by Levatino (deposition of Stephen Levatino, Ex. 13, p. 5).

4. We note also "the long-established rule that an owner or consignee may recover for damage to cargo, and that, being protected against double recovery, the carrier has no concern with any equities between the owner or consignee and others." Elia Salzman Tobacco v. SS Mormacwind, 371 F.2d 537, 540 (2d Cir. 1967). As defendant itself urges, the shippers are time barred from instituting a new and separate action to recover for their losses; the possibility of double recovery is thereby eliminated.

v. Mondial United Corp., 316 F.2d 163 (5th Cir. 1963).

■■ Additionally, it is well settled that "the agent of absent owners may libel in admiralty, either in his own name or in that of his principals." The Thames, 81 U.S. 98, 109, 14 Wall 98, 20 L.Ed. 804 (1871); Houseman v. The Schooner North Carolina, 40 U.S. 40, 15 Pet. 40, 10 L.Ed. 653 (1841). "[A]n agent's unauthorized act in filing a libel for absent owners may be subsequently ratified by them, and proof of such ratification, made before the decree is entered, will be sufficient." Aunt Jemima Mills Co. v. Lloyd Royal Belge, 34 F.2d 120, 122 (2d Cir. 1929).

Of the five shippers involved,[5] two authorized plaintiff to file suit,[6] and one subsequently ratified such action.[7] The remaining two shippers neither expressly authorized nor expressly ratified plaintiff's act of filing suit on their behalf;[8] one,[9] however, considers it "advisable for his interest that Levatino Company, Inc. filed the suit." (Exs.[10] 1 and 10.)[11]

Defendant's motion to strike portions of Stephen Levatino's deposition (Exhibit 13) is denied.[12] We note that many of the portions objected to by defendant were substantiated by the independent testimony of the shippers.

On or about December 21, 1960, 12,-846 cases of Spanish melons were delivered by six shippers to the pier at Alicante for carriage aboard defendant's vessel. The Helvig Torm arrived at the Port of New York on January 4, 1961. The melons were discharged on January 5th and 6th and placed in a heated pier warehouse at Edgewater, New Jersey. There they were inspected jointly by the parties' surveyors on January 11th and by the United States Department of Agriculture on January 13th, and found to be in damaged condition. The latter's Condition Inspection Certificates (Ex. 19) indicate that when observed on January 13th the melons showed considerable damage by bruising and by watersoaked and translucent flesh; that many if not most of the melons were ripe and firm; that soft melons were present; and that substantial decay, mostly cladosporium and fusarium rot, in advanced stages was present.[13]

3,492 cases were detroyed by dumping at the direction of the Bureau of Customs (Exs. 15 and 16). An additional 1,581 cases were destroyed by McGrath (Ex. 17).

By agreement of all parties, proof as to damages is to await the determination of liability.

■■ Under COGSA, plaintiff establishes a prima facie case by showing the good condition of the cargo at delivery and outturn by the vessel, or by the stevedore for whose conduct the vessel is

5. The sixth shipper is A. Sanchez Marin y Cia (B/L #17). As already noted, Levatino purchased his melons outright. See fn. 3, supra.

6. Bs/L #s 9, 10 and 18. Antonio Canovas Garcia exported two shipments, Bs/L #s 9 and 18.

7. B/L #20.

8. Bs/L #s 12 and 21.

9. B/L #12.

10. "Ex." followed by a number or letter refers to an exhibit in evidence. "Tr." followed by a number refers to pages of the trial transcript.

11. Exhibit 10 is the shippers' testimony taken by letters rogatory in Spain.

While marked for identification, this exhibit was not offered in evidence during the trial. Plaintiff and defendant, however, have stipulated that the exhibit be considered marked in evidence. (Defendant's Post-Trial Memorandum, p. 65).

12. Defendant objects to those portions "in which Levatino claims he owned one shipment outright and owned a 50–50 interest in the others, and that he filed this suit also for the benefit of the shippers" (Defendant's Supplemental Trial Brief, pp. 7–8).

13. The conditions noted were observed in all shipments with but one exception— no damage by bruising was reported in the Danza brand melons.

responsible,[14] in damaged condition. See M. W. Zack Metal Co. v. S. S. Birmingham City, 311 F.2d 334 (2d Cir. 1962), cert. denied, 375 U.S. 816, 84 S.Ct. 50, 11 L.Ed.2d 51 (1963); Schroeder Bros., Inc. v. Saturnia, 226 F.2d 147 (2d Cir. 1955); Levatino Co. v. S. S. Hellas, 1966 A.M.C. 40 (S.D.N.Y.); Levatino Co. v. American President Lines, supra. "The burden then lies with the carrier to exculpate itself by proving (a) that the harm resulted from an 'excepted cause', a cause for which it is statutorily not liable, or (b) that it exercised due diligence to avoid and prevent the harm." American Tobacco Co. v. Katingo Hadjipatera, 81 F.Supp. 438, 445, modified on other grounds, 194 F.2d 449 (2d Cir. 1951), cert. denied, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370 (1952); 46 U.S.C. § 1304.

■ Plaintiff sustained its burden of showing the good condition of the melons at the time of delivery to the vessel in Alicante. The evidence presented convincingly established that the melons were carefully selected and inspected; that they were disinfected (with the exception of the melons shipped under B/L #10); that no scarred, bruised, soft, overripe, diseased, or otherwise defective melons were shipped; that the melons were properly packed in wooden cases with a layer of excelsior surrounding them; and that the cases were delivered to the ship at Alicante in unbroken condition.[15]

■ Since the melons were delivered to defendant in Spain in sound condition and were received by plaintiff at the port of destination in damaged condition, plaintiff's prima facie case of liability against defendant is established. Levatino Co. v. American President Lines, supra. The burden now ordinarily shifts to defendant "to prove the damage occurred through a cause excepted under the Act or the exercise of due diligence to prevent the harm." M. W. Zack Metal Co. v. S.S. Birmingham City, supra.

### The respective contentions

■ Plaintiff, however, undertook to establish the precise causes of the damage sustained by the melons.[16] It presented evidence to show that the water-soaked, translucent condition of the melons was attributable to freezing which occurred as a consequence of exposure of the melons to sub-freezing air for several hours while a shipment of tomatoes, belonging to another consignee, were discharged first from the vessel. As for the conditions of bruising and decay, plaintiff endeavored to establish that they resulted, in the main, from improper stackage on the pier.

Defendant Torm Lines denies that the melons were frozen or that it was negligent to discharge the tomatoes first under the circumstances, and strongly asserts that the bruising and other conditions found in the melons were not due to the stacking on the pier. Defendant contends that the damaged condition of the melons was caused by their own in-

14. Torm Lines is responsible for any negligence of McGrath. A carrier is liable for any negligence of those in whose hands it has placed the goods. David Crystal, Inc. v. Cunard S.S. Co., 339 F.2d 295, 298 (2d Cir. 1964), cert. denied, 380 U.S. 976, 85 S.Ct. 1339, 14 L.Ed.2d 271 (1965).

15. The shipments were the subject of two types of inspection by Spanish Government officials, viz. an inspection for quality and an inspection for insects and diseases. The shipments apparently passed both official inspections and were given certificates authorizing their export to the United States (Exs. 8 and 9).

16. It is to be noted that plaintiff may indirectly meet its burden of establishing good condition when shipped "by showing, from the condition of the cargo as delivered or otherwise, that the damage was caused by the carrier's negligence and not by any inherent vice of the cargo." Elia Salzman Tobacco v. S.S. Mormacwind, 371 F.2d 537, 539 (2d Cir. 1967).

herent vice (shipping them late in the season) and improper packaging.[17]

McGrath contends that "any damage by freezing, or otherwise, existed on discharge from respondent's vessel at New York" (Pre-Trial Order, December 16, 1964, p. 4). In its Post-Trial Memorandum, McGrath asserts that "it did not bruise the melons and that they were not frozen."

### Damage by freezing

The Helvig Torm commenced discharging cargo on January 5th at 8:00 A.M. At that time, the forward part of No. 4 hatch was opened and a shipment of tomatoes stowed in reefer spaces was removed. Discharge of the tomatoes was apparently completed by 2:00 P.M. that same day.

The melons were stowed in Nos. 2, 3, 4 and 5 tween decks and lower holds (Tr. 409).

Spanish melons freeze at approximately 29 degrees Fahrenheit (F.). During the hours of 8 and 12 on the morning of January 5th the outside temperature ranged between 20 degrees and 28 degrees F. (Ex. 25).

Stowage in reefer spaces ensured that the tomatoes, unlike the melons, would not be exposed to the freezing temperatures prevailing outside the ship. Therefore, the melons could have been discharged first without subjecting the tomatoes to any unnecessary risk of exposure to sub-freezing air. The only reason assigned by the stevedore for first discharging the tomatoes was that "there was a call from the pier that the tomatoes had been permitted, the trucks would be down to pick them up and there would be immediate delivery" (Tr. 481).

We are in full agreement with Messrs. Kuhne and Keeler that the melons should have been discharged before the tomatoes (Tr. 135–36; 591–93).[18] We are convinced that the stevedore was negligent[19] in discharging the tomatoes before removing the melons from No. 4 tween deck and lower hold;[20] that order of discharge unnecessarily subjected the melons to the risk of damage as a result of exposure to the sub-freezing temperatures.

While convinced that the order of discharge was improper, we are not satisfied that it proximately caused any damage to the melons; the evidence does not preponderate in favor of plaintiff's contention that the watersoaked, translucent condition of the melons resulted from their exposure to sub-freezing air.

It is clear that the melons were not frozen when shipped from Alicante. During the trans-Atlantic voyage, a record of the temperatures in the various holds was maintained by the chief mate (Tr. 392; Ex. P). Readings were taken at 12 noon and 8:00 P.M. on each day of the voyage. At no time prior to arrival in New York were any of the melons subjected to temperatures below freezing. Prior to discharge on January 5th, Captain Stave,[21] Torm Lines' surveyor, took

---

17. Defendant's Post Trial Memorandum, p. 4.

18. Keeler was of the opinion that "no fruit of that nature, of any nature, should have been left in the squares where the temperature is uncontrollable as against fruit that was readily available to be left in boxes where the temperature is controllable" (Tr. 592).

19. The stevedore decided in what order the cargo would be discharged from the vessel (Tr. 413). It was at the direction of Thomas Sullivan, McGrath's superintendent in charge of discharge, that the tomatoes were removed first (Tr. 480–81).

20. We note that apparently Nos. 4 and 5 lower holds were one large hold, and Nos. 4 and 5 tween decks were one large tween deck (Tr. 418). Accordingly, if the melons stowed in No. 5 tween deck and lower hold might also be exposed to freezing temperatures as a result of opening No. 4 hatch, then they too should have been discharged from the vessel before the tomatoes.

21. Stave went below deck while the hatches were still closed, but when he reached the No. 4 hold the hatch was open (Tr. 295).

the temperature of melons in all compartments with a spear thermometer; pulp temperature, at that time, varied between 42 degrees and 50 degrees F. (Tr. 297).

Discharge of the melons commenced at 2:00 P.M. on January 5th and continued until 5:00 P.M. when the No. 4 hatch was closed—no other hatch was opened on January 5th (Tr. 404).[22] On January 6th, the hatches were opened at 8:00 A.M. and discharge of the melons completed by 7 o'clock that evening. As they were discharged from the vessel, the melons were removed to a heated pier a short distance away from where the vessel was berthed.

Chief Mate Andersen continued to record compartment temperatures aboard the vessel until discharge of the melons was completed on January 6th (Tr. 397). According to Andersen, the temperature in the ship never went below plus 4 degrees Centigrade (C.) (the equivalent of approximately 39 degrees F.).[23]

Plaintiff's contention that damage by freezing occurred is predicated mainly on the opinion testimony of surveyor McCabe and plant pathologist Ramsey to the effect that watersoaked and translucent flesh are caused by freezing injury.

On January 11, 1961, a joint survey of the melons was conducted [24] by Messrs. McCabe, Moreland, Stave, and McAllister. McCabe and Moreland were Levatino's surveyors; Stave was appointed by Torm Lines; McAllister represented McGrath. While McCabe attributed the watersoaked, translucent condition of the melons to freezing injury, Moreland and Stave were of the opinion that no damage by freezing had resulted (Exs. 23, E, and O).[25]

In his survey report of January 10, 1961 (Ex. 23), McCabe stated that in his opinion the watersoaked, translucent flesh was "associated with freezing injury, internal bruising and/or a combination of both * * *." Moreland, on the other hand, attributed the damage to "a condition of over-ripening [26] rather than a condition having been induced by freezing;" [27] he noted also that "a portion of the rot or the deterioration could

---

22. There is no evidence showing how many cases of melons were removed from the ship on January 5th.

23. There were four thermometers on the ship: one in the forward lower hold; one in the forward tween deck; one in the after lower hold; and one in the after tween deck (Tr. 418).
The following readings were obtained in No. 4 cargo compartment on January 5, 1961:

Tween deck

4:00 A.M. —— plus 4 degrees C.
12:00 Noon —— plus 6 degrees C.
8:00 P.M. —— plus 5½ degrees C.

Lower hold

4:00 A.M. —— plus 4 degrees C.
12:00 Noon —— plus 5½ degrees C.
8:00 P.M. —— plus 5 degrees C.

(Tr. 403–04; Ex. P)

On January 6th, readings were taken in all the hatches where melons were stowed; no reading of zero or less (C.) was obtained in any of those hatches— the temperatures never went below plus 4 degrees C. (Tr. 405).

24. At the time of this inspection, the pulp temperature of the melons varied between 45 and 46 degrees F. (Ex. O). McCabe had taken the pulp temperature of the melons the day before and found them to range between 45 and 50 degrees F. (Ex. 23).

25. Plaintiff's motion to strike Dr. Friedman's letter (part of Exhibit 29) from evidence is granted. The letter constitutes inadmissible hearsay evidence.

26. Moreland indicated that he was unable to state definitely the cause of the over-ripening of the fruit inasmuch as he did not see the melons in stow. He noted, however, that "it could be that during the early part of the passage the pulp temperatures could have risen much higher, increasing the ripening process" (Ex. E–1).

27. Stave reported finding some overripe melons (Ex. O). While McCabe's survey report does not indicate finding any of the fruit in that condition, he testified at trial that "the crates showed overripeness of the melons" (Tr. 64). The United States Department of Agriculture's certificates, however, do not list overripeness as one of the conditions observed (Ex. 19).

be attributed to bruising \* \* \* " (Ex. E–1). Stave, too, found no indication of freezing (Ex. O).[28]

Dr. Ramsey testified on direct examination that watersoaking and translucent areas in the flesh are "characteristic symptoms of freezing injury" (Tr. 200). On cross examination, however, he indicated that watersoaking and translucent skin could also be caused by mechanical injury or bruising. (Tr. 229). When asked whether "overripeness" could cause soaked pulp, Ramsey replied: "Well, it gets soft. I don't know whether you could—it would be an advanced stage of ripening to get really waterlogged" (Tr. 229). He agreed that the presence of watersoaked and translucent flesh is not sufficient in and of itself to support a diagnosis of damage by freezing (Tr. 230).

▆▆ We are not satisfied by a preponderance of the evidence that the watersoaked, translucent condition of the melons was caused by freezing. We can not even find, as plaintiff would have us, that sub-freezing temperatures prevailed in Nos. 4 and 5 tween decks and lower holds on January 5th. The uncontradicted testimony of Chief Mate Andersen established that the temperature inside the ship never went below plus 4 degrees C.[29]—a temperature considerably above the freezing point of melons. Even if we disregarded this testimony and found that sub-freezing temperatures prevailed in those holds, we

still would not be satisfied that the condition of the melons resulted from such exposure to sub-freezing air. In this regard, we attach some significance to the fact that while melons in all the shipments showed damage by translucent and watersoaked flesh, not all the shipments were subjected to the risk of exposure to sub-freezing air during discharge of the tomatoes.[30] As already noted, melons were stowed in Nos. 2, 3, 4 and 5 tween decks and lower holds. On January 5th, only No. 4 hatch was open during discharge of the tomatoes.

### Stackage on the pier

▆▆ A thorough examination of the photographs (Exhibit 24) taken of the pier stackage on January 11, 1961, in conjunction with the testimony adduced at trial, convinces us that the manner of stackage employed by the stevedore to stow the melons on the pier was improper.

The cases were stacked five high on each pallet with some rows of cases extending as much as three and four pallet loads high; Exhibit 24–C shows rows of cases stowed to a height of 17 and 18 tiers. We accept Kuhne's testimony to the effect that cases of melons should not be stacked more than 6 or 8 tiers high because of the undue weight exerted from above on the lower cases (Tr. 144).

The cases were not stacked cleat on cleat, i. e. end on end,[31] but rather were

---

**28.** While McAllister's survey report was not offered in evidence, it did come out during the cross-examination of William Wheeler that the report made mention of "freezing" (Tr. 504).

**29.** See fn. 23, supra.

We have considered Stave's testimony that on January 5th he observed ice in No. 3 compartment underneath the deck (Tr. 302–03). The hatch cover leading to No. 3 hold, however, was not opened on January 5th (Tr. 404). Additionally, Stave testified that he observed no ice in No. 4 hold on that date (Tr. 302).

**30.** Plaintiff itself noted that only 5,600 cases were stowed in No. 4 and 5 holds (Libelant's Trial Memorandum, p. 5a).

**31.** There was much controversy throughout the whole trial on the issue of whether or not these melon cases bulged on top and, if so, what caused them to bulge. Defendant took the position that cleat on cleat stackage was not essential since melon cases do not have a bulge. An examination of Exhibit 24 reveals that some of the cases have a slight bulge while others do not. We are convinced that such bulge, when it does appear, results from the ends of the crates being clamped down with nails and wire strapping (Tr. 141–42) and/or the presence of larger cross bars in the center of the crate. It is not caused by improper packaging, i.e. too large melons packed in the cases (Tr. 468).

stacked in an overlapping, haphazard manner.[32] The pallets too were stacked in an offsetting or overlapping fashion. Cleat on cleat stackage avoids pressure being put on the melons in the lower cases [33] and provides much needed ventilation for the fruit.[34] As Dr. Ramsey observed when viewing Exhibit 24, "they are packed so closely together that there would be literally no ventilation" (Tr. 191). In this respect, we note also the failure to employ dunnage to provide needed air circulation to dissipate the natural heat and gases emanating from the melons.

We are convinced that McGrath was negligent in the manner in which it stowed the melons on the pier.

### Damage by bruising

■ While convinced that McGrath was negligent in its manner of stackage, we are not satisfied that such negligence caused most of the bruising damage to the melons.[35]

Plaintiff's own surveyors established that the method of stacking on the pier did not cause the major portion of the bruising damage observed. McCabe was of the opinion that the chief cause of bruising occurred prior to the time that he saw the melons on the pier—"there was damage on the pier from it being offset and not properly stacked and the pallets being off, but in my opinion most of this bruising occurred prior to being placed in its present position" (Tr. 69).[36]

Moreland's survey report similarly exonerated the stevedore's careless stacking as the prime cause of bruising: "due to the excellent method of packing, that is the multiply partitions throughout the crates, we could find little or no evidence that this careless stacking had resulted in bruising to any material degree" (Ex. E–1).

Stave, Torm Lines' surveyor, too, could find no damage due to the stacking (Tr. 324).[37]

The Department of Agriculture's Condition Inspection Certificates (Exhibit 19) tend to support a finding that most of the bruising damage did not result from improper stackage of the cases on the pier. While damage by bruising was found in all shipments (with the exception of the Danza brand melons), the only cases inspected by the Department of Agriculture were those in the top layer pallets,[38] i. e. those cases least

---

Whether or not the cases bulged, we are of the firm belief that the proper practice is to stack the cases cleat on cleat. This method of stowage avoids pressure being exerted on the thin slats of the cases and helps provide needed ventilation for the fruit. The fact that all the cases may not have been the same size does not relieve the stevedore from stacking cleat on cleat as much as possible.

32. Stave found that "the crates had been put unevenly on the pallets, i.e. some of them were protruding more than others, wherefore the end and/or side boards did not rest on top of each other" (Ex. O).

33. Moreland noted that "the method of stowing was not regular in that the crates were not stowed directly above other crates, resulting in pressure being applied to unexposed areas of the battens of the crates" (Ex. E–1).

34. McCabe explained that stackage of the cases cleat on cleat provides an air channel (Tr. 75).

35. That is not to say, however, that we are satisfied that no damage resulted from said negligence. On the contrary, we believe that some bruising did result. Additionally, poor ventilation may very well have had an adverse effect on the melons. (See next section.)

36. In his January 10, 1961 report, McCabe stated: "much of bruising * * * injury so located to indicate it did not occur in present location" (Ex. 23).

37. In his survey report, Stave stated: "by putting my hands in the bottom crates at various places I could feel that the melons were free, i.e. the top boards did not rest on them" (Ex. O).

38. The following statement appears on the reverse side of the certificates: "REMARKS: Inspection and certificate restricted to product in top layer pallets stacked on pier."

affected by improper stackage (Tr. 244–45).

McCabe's survey report noted that the type and location of bruising was indicative of damage caused by tossing and dropping crates during discharge (Ex. 23).[39] Stave likewise raised the possibility of rough handling as an explanation for the bruising[40] but noted that it might also have occurred at sea.[41] There is no evidence before us showing that these cases were tossed, dropped, or otherwise roughly handled during discharge from the vessel.[42] Sullivan, McGrath's superintendent, testified that he saw no rough handling of any kind during discharge operations (Tr. 470).

We are not convinced that most of the bruising damage resulted from the stevedore's improper stackage of the cases on the pier.

### Ripeness and decay

Ripeness and decay are promoted by warmth and moisture. "[I]t is necessary that the shipments receive ventilation, that they move the air, remove gases given off by the commodities and prevent the condensation of moisture which makes an ideal situation for the development of decay and also hastens the ripeness of these commodities * * *" (Tr. 73).

The Department of Agriculture's Condition Inspection Certificates state that considerable decay in the form of clado-sporium rot and fusarium rot, mostly in advanced stages, was found when the melons were inspected on January 13, 1961. The germination of these diseases in melons is greatly favored by a bruise or cut through which the spores can invade the fruit. For the disease to enter the melon, it must find an entrance through the skin or rind (Tr. 216). The amount of injury needed for a spore to enter a melon need not be great; a very small opening will permit fungus to invade (Tr. 217).

Accordingly, bruising has a direct relationship to the decay of melons. It is, in a sense, one of the causes of such decay for it provides a means through which disease infests the fruit.

Improper ventilation likewise favors the development of disease in melons. It also hastens the ripening process and, in so doing, renders the fruit more susceptible to bruising and decay (Tr. 221–22; 224).

We have already noted the lack of proper ventilation during stowage on the pier. Its effect, however, in terms of actual damage to the melons, cannot be ascertained from the evidence presented.

We know little of the stowage aboard ship, and of the condition of the melons on arrival at the Port of New York. There is little or no evidence from which we can determine whether the melons were properly ventilated during the ocean crossing or whether they were free of

---

39. Further, at trial, he testified that "the extent of heavy bruising, quite large bruises on one side of the crate would indicate to me that they had been handled in such a manner as to force being used to cause this bruising from being dropped or thrown around or not and not just from being stacked overlapping" (Tr. 69).

40. "Some of the crates may have been roughly handled, i. e. dropped at some time, as when we opened some of them we found some bruising" (Stave's survey report, Ex. O).

41. "For instance, if the ship—winter time in northern seas the stowage can break down and the crates can tumble over and fall down, down to, for instance, from the shelter again to the lower holds and the hatches goes off and that way they can bruise and go to pieces" (Tr. 322).

42. Aside from rough handling, during discharge operations the cases were not stacked cleat on cleat. Without commenting on the propriety of such stackage during discharge from the vessel's hold, we find the evidence fails to establish that any bruising occurred as a result of it.

disease or other damage when turned over to the stevedore for discharge. As more fully discussed under the next section, such evidence is of vast importance in determining when, where, and how this damage occurred.

### Defendant's burden of proof

 Although plaintiff did not have the burden of explanation,[43] it endeavored to explain the causes of the loss. It maintained that improper order of discharge and improper stackage on the pier were the main causes of most, if not all, of the damage. We agree only in part; the stevedore was negligent, but such negligence was not the proximate cause of most of the damage.

 Plaintiff, however, did establish its prima facie case, and therefore the burden rested with the defendant to affirmatively show that the immediate cause of the damage was an "excepted cause" for which the law does not hold it responsible, or that it exercised due diligence to avoid and prevent the damage. Lekas & Drivas, Inc. v. Goulandris, 306 F.2d 426 (2d Cir. 1962); M. W. Zack Metal Co. v. S. S. Birmingham City, supra; Schroeder Bros., Inc. v. The Saturina, supra; American Tobacco Co., v. Katingo Hadjipatera, supra. The law casts upon the defendant "the burden of the loss which he cannot explain or, explaining, bring within the exceptional case in which he is relieved from liability." Schnell v. The Vallescura, 293 U.S. 296, 304, 55 S.Ct. 194, 196, 79 L.Ed. 373 (1934). The evidentiary burden thrust upon the defendant is such that he may bear "the responsibility for a loss which, in fact, may not be due to his fault, merely because the law, in pursuance of a wise policy, casts on him the burden of showing facts relieving him from liability." Supra at 307, 55 S.Ct. at 197.

In an effort to sustain its burden, defendant advanced the contention that all damage to the melons was attributable to their own inherent vice, i. e. shipping them too late in the season to withstand a trans-Atlantic voyage, and improper packing by the shippers, 46 U.S.C. § 1304 (2) (m) and (n). We discuss the latter first.

### [As to improper packing]

 We find no credible evidence to support defendant's assertion that the melons were improperly packed. To the contrary, the evidence abounds in support of a finding of proper packing.

Moreland's survey report stated that "the excellent method of packing, that is the multiply partitions throughout the crates" prevented the stevedore's careless stacking from resulting in bruising injury to any material degree (Ex. E–1). McGrath's superintendent, Sullivan, testified that he felt the melons were properly packed (Tr. 475). Stave, Torm Lines' own surveyor, upon checking

---

43. Defendant's post-trial memorandum conveys to this Court the distinct impression that defendant has been laboring under the mistaken belief that plaintiff has the burden of explaining the loss. It is well settled law that plaintiff makes out a prima facie case by showing the good condition of the cargo at delivery and its outturn damaged. The burden then rests with the carrier to explain the loss.

The situation presently confronting us does not come within the rule of those cases holding that once defendant brings itself within an enumerated exception (46 U.S.C. § 1304(2) (a)–(p)), it will not be held liable unless it appears that its negligence contributed to the damage, and the burden of proof on that issue is on plaintiff. See Copco Steel & Engineering Co. v. S. S. Alwaki, 131 F.Supp. 332 (S.D.N.Y.1955); George F. Pettinos, Inc. v. American Export Lines, 68 F. Supp. 759 (E.D.Penn.1946), aff'd, 159 F.2d 247 (3d Cir. 1947); Daido Line v. Thomas P. Gonzalez Corp., 299 F.2d 669 (9th Cir. 1962). Compare Missouri Pacific Railroad Co. v. Elmore & Stahl, 377 U.S. 134, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964); Mamiye Bros. v. Barber Steamship Lines, Inc., 241 F.Supp. 99 (S.D. N.Y.1965), aff'd 360 F.2d 774 (2d Cir.), cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966).

found free space between the boards of the case and the melon proper (Tr. 315); he considered this good packing (Tr. 364). Further, in those cases opened the melons were not found to be in contact with the top slats of the case, thus indicating that the shippers had properly packed their fruit (Tr. 468).[44]

[As to inherent vice]

The inherent vice here alleged is that the melons were shipped too late in the season (they were too ripe)[45] to withstand the ocean voyage. Defendant has not brought forth any convincing proof to substantiate this contention. The convincing evidence presented by plaintiff, on the other hand, establishes that the melons were of the proper degree of ripeness for export to the United States. They were carefully inspected and selected by the Spanish shippers. Those melons found to be soft or mature were removed and only the firm ones remained for export. At the pier in Spain, the melons were again inspected, this time by a government official· who checked their degree of ripeness; overripe melons were rejected (Ex. 8).[46]

Defendant has offered no evidence to establish that the fruit was in fact shipped too late in the season. According to one of the Spanish inspectors, "[t]he heavy shipping season to the United States is from October to December," and in 1960 the season extended until February, 1961 (Ex. 8).

Assuming the melons were harvested in Spain during the months of July, August, and September and shipped to the United States in December, there is little to substantiate the contention that this interval was a protracted one; no evidence was offered as to the proper interval of time between harvesting and shipment. Surely such information, if conclusive, was within defendant's grasp.

Torm Lines has similarly failed in its burden of proving causal connection between the alleged inherent vice and the damage. See American Tobacco Co. v. Goulandris, 173 F.Supp. 140 (S.D. N.Y.1959), aff'd, 281 F.2d 179 (2d Cir. 1960). No credible proof was adduced to establish that the damage was caused by any inherent vice of the melons. We reject as untenable Stave's testimony that the conditions he observed on January 11, 1961 were caused by aging (Tr. 316). While melons may become more susceptible to bruising and decay as they age and ripen, there is nothing to indicate that aging or ripening in and of itself would so damage a melon.[47]

The situation confronting us is not unlike that[48] in Missouri Pacific Railroad Co. v. Elmore & Stahl, 377 U.S. 134, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964), where the Supreme Court answered affirmatively the question "whether a common carrier which has exercised reasonable care and has complied with the instructions of the shipper, is nonetheless liable to the shipper for spoilage in transit of any interstate shipment of perishable commodities [honeydew melons], when the carrier fails to prove that the cause of the spoilage was the natural

---

44. See fn. 31, supra.

45. Defendant's Post Trial Memorandum, p. 37.

46. We find no merit to defendant's assertion that a sugar test should have been given this fruit. There is nothing to indicate that such test was usual or customary in Spain or for that matter that it was ever employed there. The fact that sugar tests may be given melons in South America is certainly not determinative. Additionally, we have little in-

formation upon which to appraise the merits of such a test.

47. Moreland did attribute some of the damage to "a condition of over-ripening." Assuming, arguendo, that he was correct, what caused this over-ripening? See p. 18, supra.

48. One overpowering difference does exist; Torm Lines certainly has not demonstrated to this Court that it exercised reasonable care in handling, caring for, and stowing the cargo.

tendency of the commodities to deteriorate." Supra at 135, 84 S.Ct. at 1143. In the course of rejecting the carrier's contention that it should not have to bear the burden of explaining the cause of the damage, the Supreme Court stated:

The general rule of carrier liability is based upon the sound premise that the carrier has peculiarly within its knowledge '[a]ll the facts and circumstances upon which [it] may rely to relieve [it] of [its] duty * * *. In consequence, the law casts upon [it] the burden of the loss which [it] cannot explain or, explaining, bring within the exceptional case in which [it] is relieved from liablility.' Schnell v. The Vallescura, 293 U.S. 296, 304, 55 S.Ct. 194, 196, 79 L.Ed. 373. We are not persuaded that the carrier lacks adequate means to inform itself of the condition of the goods at the time it receives them from the shipper, and it cannot be doubted that while the carrier has possession, it is the only one in a position to acquire the knowledge of what actually damaged a shipment entrusted to its care. Supra at 143–144, 84 S.Ct. at 1148.[49]

The Court of Appeals in Daido Line v. Thomas P. Gonzalez, 299 F.2d 669, 671 (9th Cir. 1962), distinctly stated the situation when it noted:

Theoretically, both parties have the burden of proof on the same issue—

the condition of the cargo. The shipper is obliged to establish that the garlic was in good condition to make its prima facie case, but the carrier is burdened with proving that the garlic suffered from an inherent defect in order to bring itself within the statutory exception from liability.

While plaintiff has sustained its burden, defendant has failed to establish that the melons suffered from an inherent vice which caused their damage and decay.

[Due diligence]

█ Since defendant has failed to establish that the damage was the result of an "excepted cause," it was incumbent upon it to show that it exercised due diligence to avoid the damage. 46 U.S.C. § 1304(2) (q); General Foods Corp. v. The Troubador, 98 F.Supp. 207 (S.D.N.Y. 1951). The burden lay with Torm Lines to prove that it was not negligent in handling, caring for, and stowing the cargo. No attempt whatsoever was made to meet this burden of proof.

Throughout the trial, defendant labored under the misapprehension that its own handling of the goods was not an issue in the case; that plaintiff's only claim, and the only grounds upon which it could recover, was for damage caused by the stevedore's negligence, the negative of which it vigorously supported.[50]

---

49. The Elmore & Stahl case dealt with a railway carrier but, "unless the provisions of COGSA can be said to be to the contrary (which seems not possible), the language seems applicable to maritime cargo claims." Mamiye Bros. v. Barber Steamship Lines, Inc., 241 F.Supp. 99 (S.D. N.Y.1965), aff'd, 360 F.2d 774 (2d Cir.), cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966).

50. In its post-trial reply brief, defendant stated: "Torm Lines would be liable only if the stevedores caused any damage" (p. 7).
On two occasions, defendant's attorney objected to questions posed by Mr. Prem, plaintiff's attorney, which were designed

to elicit testimony on the propriety of stowage aboard the vessel (Tr. 130–33; 424). Defendant maintained that the Pre-Trial Order (dated December 16, 1964) did not set forth the contention that the cases were badly stowed aboard ship. Plaintiff thought the point well taken, and agreed to confine its questions to "the freezing and the improper stowage on the dock" (Tr. 133). A reading of the Pre-Trial Order, however, leaves this Court with the distinct understanding that stowage aboard ship was an issue in this case. Paragraph 8 sets forth as one of the issues to be tried: "Did any of the melons sustain damage while in the custody or under the control of respondent and, if so, what type

Defendant's handling of the cargo aboard ship was most definitely an issue in this case. Once plaintiff established a prima facie case, defendant had the burden of bringing the loss within an "excepted cause," or proving its own due diligence to avoid or prevent the damage. The fact that plaintiff endeavored to prove that the stevedore's acts caused the damage did not relieve defendant of its burden in the event plaintiff's proof was rejected.

During the course of the trial, defendant and McGrath stood united in an effort to prove that the latter's acts did not cause any damage to the melons. Our determination that most of the damage did not result from McGrath's negligence accords with defendant's contention. This finding, however, coupled with a determination of sound condition on delivery and a rejection of defendant's assertion of inherent vice and improper packing, leaves the question of causation unresolved. Defendant should have anticipated that such a situation might present itself and accordingly come forth with proof of its own due diligence.

From the total record before us, we can make no affirmative finding as to the cause or causes of most of the damage sustained. There is no showing that defendant performed its duty to properly stow, carry, keep, and care for the melons. 46 U.S.C. § 1303(2). For all we know, most of the damage may have occurred aboard ship as a result of defendant's negligence: the goods may have been improperly stowed[51] and cared for; poor ventilation may have hastened the ripening process; heavy seas[52] may have joined with improper stacking to bring about bruising and decay.[53] When left to speculate, many such possibilities present themselves.

In sum, we know extremely little of the condition of the fruit when released into the custody of McGrath for discharge.[54] There is no evidence showing whether or not any damage existed prior to discharge from the vessel.

Defendant has failed to sustain its burden of proof; it has neither brought the loss within an "excepted cause" nor established its own due diligence to avoid or prevent the damage. The cause(s) of most of the damage remains unexplained.[55] Under such circumstances, defendant must bear the

of damage was concerned, and did this constitute a breach of the carrier's contractual or legal duties?" In paragraph 3(c), defendant itself contended "that the melons were properly and carefully loaded, stowed and cared for, and that any damage by freezing, bruising, or otherwise, occurred prior to loading or after discharge * * *." McGrath's position in the Pre-Trial Order was that "any damage by freezing, or otherwise, existed on discharge from respondent's vessel at New York" (¶ 3(d)). Additionally, plaintiff's trial memorandum is replete with references to improper stowage in the ship's hold. In any event, we do not construe plaintiff's agreeing to limit its scope of questioning as a concession that the goods were properly stowed aboard ship or that no damage occurred during the ocean crossing and prior to commencement of discharge on January 5th.

51. Andersen testified that the cases were not stowed cleat on cleat aboard ship (Tr. 424).

52. "The voyage was uneventful, except on December 24/25, when the ship encountered winds from NNW-NW-N'ly force 4–9, causing the ship to roll heavily in the heavy sea." (Stave's survey report, Ex. O).

53. Both Kuhne and Stave expressed the thought that bruising damage can occur when a ship encounters heavy seas (Tr. 163; 322).

54. Stave examined the cargo prior to discharge on January 5th. He testified that "they looked good," but he "didn't open any crates" and therefore could not actually see the melons (Tr. 300).

55. We find no merit to the contention that the damage resulted from plaintiff's failure to take prompt delivery after the melons were discharged from the ship.

burden of the loss. Accordingly, we find for plaintiff.

### Torm Lines v. McGrath

Torm Lines' claim over against McGrath poses its own dilemma. Defendant has not contended that McGrath was negligent; on the contrary, it has come to McGrath's aid in an attempt to rebut plaintiff's assertion of McGrath's negligence. Throughout the trial, and in its post-trial and reply memoranda, defendant vigorously maintained that the melons were not frozen and that the damage was not due to the manner in which the cases were stacked on the pier. We agreed with these latter two contentions up to a point. While not convinced that the improper stackage on the pier caused most of the bruising damage, we do believe that some damage did result from such negligence.[56] We are unable, however, to ascertain what portion of the damage so resulted. There is no evidence before us upon which to predicate an apportionment of liability.

█ Thus, while McGrath's negligence (improper stackage) is evident, the precise effect of it has not been established. We do know that such negligence was not the major cause of bruising injury; we are satisfied, however, that it did cause some damage. Accordingly, defendant will be afforded an opportunity at the hearing on damages to present evidence as to what portion of the damage resulted from McGrath's negligent stackage of the cases on the pier.[57] As we now see it and unless convinced to the contrary, failing such proof, defendant must bear sole responsibility and liability for the loss.

As to liability only, the foregoing shall constitute this Court's Findings of Fact and Conclusions of Law. Either party, upon notice to the other, may, within ten days from date, propose separately numbered and also additional findings not inconsistent with the foregoing.

The time and place for the presentation of evidence with respect to damages will be discussed with counsel at an early date thereafter.

---

56. Defendant wound up arguing against its own claim over, for if we had fully agreed with its contentions, defendant would have no recourse against McGrath.

57. While we found McGrath negligent in its order of discharge of commodities from the vessel, no injury to the melons resulted from it. Additionally, rough handling of the cases during discharge has not been established.